Filed 10/30/15; pub. order 11/24/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALFREDO RAMOS,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>WESTLAKE SERVICES LLC,<br><br>      Defendant and Appellant. | A141353<br><br>(Alameda County<br>Super. Ct. No. RG13682419) |

Defendant Westlake Services LLC appeals from the trial court order denying its motion to compel arbitration as to plaintiff Alfredo Ramos. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Ramos's Underlying Complaint*

Alfredo Ramos, and coplaintiffs who are not parties to this appeal,[1] sued Defendant Westlake Services LLC (Westlake) for causes of actions arising out of their purchase of used automobiles. In the operative first amended complaint filed July 30, 2013, Ramos alleged that he "purchased an automobile from Pena's Motors. Upon arrival, he was greeted by one of this dealership's employees, who spoke with him in his native tongue (i.e., Spanish). Negotiations for this transaction were conducted primarily in Spanish. Pena's Motors and its employees had authority to sell and make representations on behalf of Westlake with respect to the sale of its GAP contracts

---

[1] Coplaintiffs were Lorena Castillo and Jesus Vasquez. Only Ramos is party to this appeal.

1

covering automobiles. Defendant eventually charged RAMOS money for a GAP contract to cover the vehicle he purchased. A copy of the GAP contract ('Guaranteed Auto Protection—GAP Waiver' form) was not provided to him in Spanish."

As alleged by Ramos, a "GAP" contract is an "optional insurance policy contract that is sold to or purchased by a consumer in conjunction with his or her purchase and financing of an automobile. In exchange for the payment of a premium by the consumer and/or purchaser of the automobile, the 'GAP' insurance policy contract, which identifies the respective rights and liabilities of the parties to the contract, is purportedly intended to pay the difference between the actual cash value of the financed automobile and the then-current outstanding balance on the loan for the automobile should the financed automobile be destroyed or 'totaled' in an accident."

Ramos asserted three causes of action based on Westlake's failure to provide a translation of the GAP contract: (1) violation of the Consumers Legal Remedies Act (CLRA), Civil Code section 1750, et seq.[2]; (2) violation of section 1632[3]; and (3) violation of the unfair competition law (UCL), Business and Professions Code section 17200, et seq.

B.    *Westlake Moves to Compel Arbitration*

On November 14, 2013, Westlake moved to compel arbitration of Ramos's and his coplaintiffs' claims, relying on the arbitration provisions contained in the underlying

---

[2] All further unspecified statutory references are to the Civil Code.

[3] Section 1632 provides in relevant part that "[a]ny person engaged in a trade or business who negotiates primarily in Spanish" in certain transactions, including auto sales, "shall deliver to the other party to the contract or agreement and prior to the execution thereof, a translation of the contract or agreement in the language in which the contract or agreement was negotiated, that includes a translation of every term and condition in that contract or agreement." (§ 1632, subd. (b).) Notwithstanding the translation provided, the "terms of the contract or agreement that is executed in the English language shall determine the rights and obligations of the parties," but the translation "shall be admissible in evidence only to show that no contract was entered into because of a substantial difference in the material terms and conditions of the contract and the translation." (§ 1632, subd. (j).) If a translation is not provided, "the person aggrieved may rescind the contract or agreement." (§ 1632, subd. (k).)

sales contracts they each had signed. In support of the motion, Westlake provided the declaration of John Schwartz, the manager of dealer compliance and first payment collection for Westlake, and one of its custodians of records. Pertinent for our purposes is Exhibit 3 to Schwartz's declaration, which Schwartz identified as a copy of the "Conditional Sale Contract and Security Agreement that Alfredo Ramos entered into when he purchased his 2005 Ford Expedition from Pena's Motors in July 2011." According to Schwartz, Ramos's contract was later assigned to Westlake.

The Conditional Sale Contract and Security Agreement attached to Schwartz's declaration is in English (English Contract). It is signed by Ramos and a representative from Pena's Motors. Page 6 of the contract has a section heading highlighted in bold that states "Please Read Carefully! Notice of Arbitration." This section of the contract contains the arbitration agreement that is the basis of defendant's motion; it purports to cover "any claim or dispute in contract, tort, statute or otherwise between you and us or our employees . . . that arises out of or relates to your credit application, this Contract or any related transaction or relationship."[4] The arbitration agreement ends by stating: "CAUTION: It is important that you read this Arbitration Agreement thoroughly before you sign this Contract. By signing it, you are saying that you have read and understand this Arbitration Agreement, and have received a copy of it. If you do not understand something in this Arbitration Agreement, do not sign this Contract; instead ask your lawyer. You or we may reject this Arbitration Agreement by sending to the other a

---

[4] The arbitration agreement provides for arbitration through National Arbitration and Mediation and states that the arbitrator "shall have no jurisdiction or other authority . . . to preside over or rule on any claim asserted or litigated as a class action, representative action, or similar proceeding." Westlake agrees to advance Ramos a maximum of $1,500 to cover filing, administration, and related expenses. The arbitration agreement provides that each party is responsible for its own costs and attorneys' fees, unless the arbitrator awards costs or fees to a party. Either party may seek to appeal the initial arbitrator's award to a second arbitrator only where the "amount in controversy is in excess of $100,000.00 or involves a claim or order for permanent injunctive relief." In addition, certain remedies are exempted from the arbitration provision, such as self-help remedies or judicial provisional remedies.

3

rejection notice by certified mail or by messenger service within 10 days after signing this Contract."

C.     *Ramos's Opposition to the Motion to Compel Arbitration*

In support of his opposition to the motion to compel, Ramos submitted his own declaration, which had been prepared with the assistance of an interpreter. Each English paragraph in Ramos's declaration is followed by a Spanish translation of the text.

Ramos's declaration is the only evidence in the record of what happened in connection with his purchase of the used automobile, and we quote it verbatim, omitting only the paragraph numbers. "On July 2, 2011, I purchased an automobile from Pena's Motors in Brentwood. Upon arrival, I was greeted by one of the dealership's employees, who spoke with me in my native language, Spanish. [¶] Negotiations for this transaction were conducted primarily in Spanish. [¶] During the negotiations for the transaction and the signing of the paperwork, arbitration and alternative dispute resolution never came up. [¶] Although the dealer provided me with a Spanish translation of a conditional sale contract, the Spanish copy of the contract was different than the English copy of the contract which I was told to sign. The Spanish version of the sales contract does not have the 'Arbitration' clause. Further, I do not recall ever receiving a Spanish translation of the actual GAP contract or of any forms pertaining to GAP coverage. [¶] For the first time, I learned from my attorney that I had 'agreed' to arbitrate all claims against Defendant. I was surprised and had I known about these I would not have agreed to it."

Ramos's declaration was accompanied by two declarations from Angelica Mendez. One of Mendez's declarations states essentially that she is a certified interpreter who primarily translates for the Superior Court of Santa Clara County; she "assisted . . . Ramos in the preparation of his declaration;" she "accurately translated from the English language to the Spanish language, and from the Spanish language to the English language, in the preparation of [Ramos's] declaration;" and she "made a true interpretation of Plaintiff's testimony in this matter."

The other declaration from interpreter Mendez, entitled "Declaration of Interpreter Angelica Mendez re Spanish Language Version of the Sales Contract," states in pertinent

4

part as follows: "3. I have reviewed the English version of the 'Conditional Sale Contract and Security Agreement' signed by Mr. Alfredo Ramos attached as Exhibit A. [¶] 4. I also reviewed the Spanish version of the 'Conditional Sale Contract and Security Agreement' signed by Mr. Alfredo Ramos attached as Exhibit B. [¶] 5. The Spanish copy of the 'Conditional Sale Contract and Security Agreement' is different from the English copy of the 'Conditional Sale Contract and Security Agreement.' *The Spanish version of 'Conditional Sale Contract and Security Agreement' does not have the arbitration clause.*" (Emphasis added.)

It is undisputed that the English version of the Conditional Sale Contract and Security Agreement referred to in the Mendez declaration is the same as the English Contract attached to the Schwartz declaration. It is also undisputed that the Spanish version of the contract offered by Ramos (Ramos Translation) has no arbitration clause. The Ramos Translation contains Ramos's typewritten name and address, his signature on a number of pages, and terms of the car purchase (for example, the price, vehicle identification number, and the like).

Ramos argued in his opposition to the motion to compel arbitration that there was no agreement to arbitrate between him and Westlake. The contract was negotiated primarily in Spanish and an accurate translation that included the arbitration provision was never provided. Ramos, citing *Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*), argued that there was fraud in the execution of the arbitration agreement and thus mutual assent was lacking because the parties never discussed arbitration, and he had never seen the arbitration clause because it was "hidden in the English version of the [underlying sales contract]." Ramos also argued that Westlake's failure to provide an accurate Spanish translation resulted in a violation of section 1632 and, as a result, the entire contract was "unenforceable and void, including

the arbitration clause;" and that the arbitration agreement was procedurally and substantively unconscionable and should not be enforced.[5]

D.    *Westlake's Reply Brief*

In its reply brief, Westlake attacked the Ramos Translation as "inadmissible, because no foundation had been laid for it." Westlake offered a supplemental declaration of John Schwartz, who this time identified himself as "one of the Westlake employees who has custody, supervision, and control of the records and documents regarding the conditional sale contacts [sic] that Westlake purchases from dealers." Based on his "review of Westlake's files and documents" for Ramos, he attached as Exhibit 1 what he represented was "a true and correct copy of the Spanish version of Ramos's Conditional Sale Contract and Security Agreement that Pena's Motors provided to Westlake when Westlake purchased Ramos's contract." We refer to this version as the Westlake Translation.

In many ways, the Westlake Translation is the same as the Ramos Translation. The same form publisher appears to have produced both Spanish translations; the terms of the underlying car sale and loan are typed on both forms; and every substantive provision in the Ramos Translation is contained in the same place, verbatim, in the Westlake Translation. There is one key difference. Unlike the Ramos Translation, the Westlake Translation has an arbitration agreement, in Spanish, on the penultimate page of the document. The arbitration provision contained in the Westlake Translation is for the most part the same as the arbitration provision in the English Contract, with the exception that the Spanish arbitration provision names the American Arbitration Association and National Arbitration Forum as the arbitration provider, rather than National Arbitration and Mediation in the English Contract. Further, the Westlake Translation has no signatures.

---

[5] Ramos's argument that there was no agreement to arbitrate because the Spanish translation Ramos received did not contain an arbitration provision is completely separate from the merits of his underlying claims that Westlake violated various California statutes by failing to provide a translation of the "GAP" insurance contract.

In sum, while Ramos offered a Spanish translation of the underlying sales contract which made no reference to arbitration, Westlake produced in reply a Spanish translation of the underlying sales contract which included an arbitration agreement. This was the evidence presented to the trial court.

E.    *The Trial Court's Ruling on Westlake's Motion to Compel*

On January 22, 2014, the trial court issued an order granting Westlake's motion to compel arbitration as to coplaintiffs Castillo and Vasquez, but denying the motion to compel arbitration as to Ramos.

As to Castillo and Vasquez, the trial court found that because both admitted that they received Spanish translations of their sale contracts at the time of their transactions, they could not rely on section 1632 to avoid arbitration. The court also rejected Castillo and Vasquez's unconscionability argument, finding that they had demonstrated only a "minimal degree of procedural unconscionability" and had failed to show that any substantive terms in the arbitration provision were overly one-sided.[6]

As to Ramos, however, the trial court found that while he had received a Spanish translation of the English Contract, the translation he received did not contain an arbitration agreement. The court recognized the differences between the Ramos Translation and the Westlake Translation, detailed above, and noted the "variation in the overall number of pages [between the two versions] is explained by the entire absence of what appears in Westlake's version as 'Pagina 7 de 9,' upon which the arbitration provision—and only the arbitration provision—appears." The court took this "as an indication that this particular forms publisher offered versions of the [retail installment sale contract] (at least those in Spanish) both with and without an arbitration provision." The court rejected Westlake's argument that the Westlake Translation was the only translation properly before the court: "The Supplemental Declaration of John Schwartz attaches 'a true and correct copy of the Spanish version of Ramos' [retail installment

---

[6] As we have noted, Castillo's and Vasquez's cases are not before us on appeal.

7

contract][7] that Pena's Motors provided to Westlake when Westlake purchased Ramos' contract . . . .' The issue here, however, is what Ramos agreed to, not what Westlake was given by the seller. As to the manner in which Ramos placed the Spanish language translation into evidence, while the exhibit was not attached to the Ramos declaration, and the interpreter's declaration does not attempt to authenticate it, Ramos does clearly state in his declaration that the Spanish version of the RISC provided to him by the dealer does not have the Arbitration clause. Furthermore, the version presented by Ramos includes his signature and initials in multiple locations, which the version presented by Westlake does not. Accordingly, the court accepts that the version presented by Ramos is a true and correct copy of the one he was given, notwithstanding that he fails to actually use the words 'true and correct copy.' "

Because the Spanish translation Ramos received did not include an arbitration provision, the trial court held that "by operation of . . . section 1632, . . . Westlake has failed to establish the existence of an arbitration agreement enforceable against Ramos." As an alternative holding, the court held that "providing an English version of a contract with an arbitration clause together with a translated version of the contract without such a clause changes the unconscionability analysis so as to make the arbitration clause unenforceable on that alternative ground."

F.       *Westlake's Motion for Clarification and the Subsequent Hearing*

Westlake filed a motion for clarification of the trial court's order denying its motion to compel, inquiring whether the court's section 1632 ruling meant the entire English Contract was void or voidable, or only the arbitration agreement. Westlake also sought to have the trial court explain why it found the arbitration agreement unconscionable. The trial court denied the motion for clarification, but at the hearing stated that its ruling permitted Ramos to make an election to declare the entire English

---

[7] The trial court referred to each plaintiff's underlying sales contract as a RISC—an acronym for retail installment sales contract. Castillo's and Vasquez's contracts bore that title. Ramos's contract was entitled Conditional Sale Contract and Security Agreement.

Contract void as a result of the section 1632 violation or to stand on the contract, but with the unconscionable arbitration provision excised.

This appeal followed.

## DISCUSSION

A. *Trial Court's Admission of the Ramos Translation*

Westlake argues that the trial court erred in admitting the Ramos Translation over Westlake's foundation and authenticity objections, and that without a proper foundation the trial court abused its discretion in determining that the Ramos Translation was the Spanish translation Ramos received. We reject these contentions.

"When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; see also *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 523 ["Conclusory assertions of error are ineffective in raising issues on appeal"].) That is the case with Westlake's evidentiary objections to the Ramos Translation. In its opening brief, Westlake does not cite any Evidence Code sections or legal authority in support of these arguments. In reply, Westlake makes a vague reference to "keystones of the evidentiary rules [that] cannot be ignored" and cites Evidence Code sections 702, 1400, and 1401 in passing, without more. Tellingly, these sections of the Evidence Code are not even listed in Westlake's Table of Authorities. (Cal. Rules of Court, rule 8.204(a)(1)(A) [appellate briefs must "[b]egin with a table of contents and a table of authorities separately listing cases, constitutions, statutes, court rules, and other authorities cited"].) Accordingly, Westlake has waived its evidentiary objections to the Ramos Translation by failing to adequately address them on appeal.

Were we to overlook Westlake's failure to adequately raise these arguments, we would reject them on the merits. Under Evidence Code section 1401, "[a]uthentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) To authenticate a writing, the proponent of the writing must introduce "evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence

9

claims it is." (Evid. Code, § 1400.) There is no strict requirement as to how a party authenticates a writing. (See Evid. Code, § 1410 ["Nothing in this article shall be construed to limit the means by which a writing may be authenticated or proved."].) "For example, a writing can be authenticated by circumstantial evidence and by its contents." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.) "A trial court's finding that sufficient foundational facts have been presented to support admissibility is reviewed for abuse of discretion." (*People v. Smith* (2009) 179 Cal.App.4th 986, 1001.)

The trial court did not abuse its discretion in admitting the Ramos Translation. Ramos's declaration and the contents of the Ramos Translation together provide circumstantial evidence of its authenticity. The Ramos Translation contains the details of Ramos's automobile purchase and both Ramos's signature and the signature of a representative of Pena's Motors on multiple pages. Westlake does not dispute that the Ramos Translation is an accurate translation of the English Contract, with the exception of the absence of the arbitration provision. The same form publisher appears to have created both the Ramos Translation and the Westlake Translation. In fact, the Ramos Translation is virtually identical in form, appearance, and language to the Westlake Translation that Westlake admits it received from Pena's Motors.[8]

Given the circumstantial evidence of authenticity, we conclude the trial court did not abuse its discretion in admitting the Ramos Translation and finding, as a factual matter, that the Ramos Translation was the Spanish translation Ramos received at the time of the transaction.

---

[8] Westlake's contention that the Ramos Translation should have been excluded on grounds of relevance, given that an "inference" can be drawn from Ramos's declaration that he read both the English Contract and its Spanish Translation at the time of the vehicle purchase is absurd. Westlake's objection rests upon the premise that Ramos knew at the time of the vehicle transaction that the Spanish translation was different from the English Contract. Nowhere in Ramos's declaration, however, did Ramos state that he compared the two agreements at the time he received them. To the contrary, Ramos stated that he learned "[f]or the first time" from his attorney that he had purportedly "agreed" to arbitrate his claims.

10

B.      *Whether an Arbitration Agreement Exists*

On appeal, Westlake argues the trial court erred by finding that Westlake had not demonstrated the existence of an agreement to arbitrate. Westlake contends that because there is no dispute that Ramos signed the English Contract containing the arbitration agreement, the only remedy available to Ramos for a violation of section 1632 is to rescind the entire English Contract, not to excise the arbitration provision. We conclude substantial evidence supports the trial court's conclusion that Westlake failed to prove the existence of an agreement to arbitrate. However, we reach this conclusion through application of contract formation principles and not section 1632 and therefore need not address Westlake's arguments regarding the proper remedy under that statute.

1.      *Relevant Law*

Code of Civil Procedure section 1281.2 provides that "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate . . . the court shall order the petitioner and respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." Arbitration is a matter of contract. (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59 (*Avery*).) " 'Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement[.]' " (*Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1128.)

Thus, when presented with a motion to compel arbitration, the court's first task is to determine whether the parties have entered into an agreement to arbitrate their claims. (*Avery*, *supra*, 218 Cal.App.4th at p. 59.) Courts "apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute." (*Id.* at p. 60.) "General contract law principles include that '[t]he basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contract[.]" (*Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164, 1170.) "Contract law also requires the parties agree to the same thing in the same sense." (*Avery*, *supra*, 218 Cal.App.4th at p. 60.) "The petitioner [seeking arbitration] bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, while a

11

party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. [Citation.]  The trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence, and any oral testimony the court may receive at its discretion, to reach a final determination. [Citation.]" (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 842.)

" 'There is no uniform standard of review for evaluating an order denying a motion to compel arbitration.  [Citation.]  If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.]  Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed.  [Citations.]' " (*Avery, supra,* 218 Cal.App.4th at p. 60, quoting *Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425.)  "[W]hen ruling on a petition to compel arbitration, the superior court may consider evidence on factual issues such as contract formation bearing on the threshold issue of arbitrability. . . .  On appeal we must review the court's factual ruling on arbitrability under the substantial evidence test." (*City of Vista v. Sutro & Co.* (1997) 52 Cal.App.4th 401, 407.)  " '[W]e review the trial court's order, not its reasoning, and affirm an order if it is correct on any theory apparent from the record.' " (*Adajar v. RWR Homes, Inc.* (2008) 160 Cal.App.4th 563, 571, fn. 3.)

2.      *Discussion*

It is undisputed that Ramos signed the English Contract and that this contract contains an arbitration agreement.  Ramos, however, argues that he was not aware that he was entering into an arbitration agreement because "[t]he words 'arbitration' or 'alternative dispute resolution' never came up during Plaintiff's discussions with the dealership, and Plaintiff never saw the arbitration clause because it was hidden in the English version of the RISC."  Although there is no evidence to contradict these facts, typically these arguments would not be dispositive and a person would be bound by the arbitration agreement he or she had signed.  " 'No law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract[.]' " (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1674.)  Further, " 'one who

12

accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it. If he cannot read, he should have it read or explained to him.' " (*Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163 (*Randas*), quoting 1 Witkin, Summary of Cal. Law (9th ed. 1987) § 120, p. 145.)

The circumstances of this case, however, are not typical. Spanish, not English, is Ramos's primary language. When Ramos went to Pena's Motors, he was greeted in Spanish and the negotiations for the purchase of the automobile were conducted primarily in Spanish. Pena's Motors then provided Ramos with what purported to be a translation of the English language contract he was about to sign. In his declaration, which was prepared with the assistance of a Spanish translator, Ramos contended that he was not aware that the English contract he signed on July 2, 2011, contained an arbitration provision until he spoke with his attorney much later. All of these facts give rise to a reasonable inference that Ramos has a limited ability to understand English. (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71 ["[W]e must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of the credibility of witnesses and the weight of the evidence."].)[9] The contract he ultimately signed, however, was in English.

Under the general contract principles just discussed, the fact that Ramos signed a contract in a language he may not have completely understood would not bar enforcement of the arbitration agreement. If Ramos did not speak or understand English sufficiently to comprehend the English Contract, he should have had it read or explained to him. (See *Randas*, *supra*, 17 Cal.App.4th at p. 163; see also 1 Williston on Contracts (4th ed.) § 4:19 ["[O]ne who is ignorant of the language in which a document is written, or who is illiterate [who] executes a writing proposed as a contract under a mistake as to its contents . . . is bound."]) Here, however, Ramos is not attempting to avoid the

---

[9] In his brief on appeal, Ramos asserts that he is a "native Spanish speaker with a limited ability to speak English." His declaration before the trial court, however, does not contain any express statement to this effect.

arbitration agreement because of his limited understanding of the English language. Rather, he is relying on the fact that Pena's Motors provided him with what purported to be a Spanish translation of the English contract he was being asked to sign, a Spanish translation which did *not* contain the arbitration agreement.

The trial court made a factual finding that the Ramos Translation was a "true and correct copy of the one [Ramos] was given" and that "the Spanish language translation of the RISC provided to Ramos at the time of the auto purchase transaction did not include an arbitration provision." As a result of its factual findings, the trial court concluded, "by operation of . . . section 1632," that Westlake "failed to establish the existence of an arbitration provision." We agree with the trial court's ruling denying the motion to compel arbitration but affirm on a different ground raised by Ramos, but not explicitly addressed by the trial court: there was no mutual assent because the arbitration agreement was hidden in the English Contract and not included in the Ramos Translation. This is a claim of fraud in the execution (otherwise known as fraud in the inception) of the arbitration agreement.[10] We conclude that Westlake failed to establish an agreement to arbitrate because it did not demonstrate the existence of mutual assent.

---

[10] We treat Ramos's fraud in the execution argument as a challenge to the formation of the arbitration agreement specifically, and not to the English Contract as a whole. The arbitration agreement is, in effect, its own contract contained within the English Contract. In the English Contract, the arbitration provision is described as an arbitration "agreement," and it expressly states that "[t]his Arbitration Agreement survives any termination, payoff or transfer of this Contract." The arbitration agreement also has its own severability clause as well as a provision allowing either party to specifically reject it by "sending to the other a rejection notice by certified mail or by messenger service within 10 days after signing this Contract."

Treating the arbitration agreement as distinct from the contract as a whole finds support in case law. For example, in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, the United States Supreme Court addressed whether a "a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." (*Id.* at p. 402.) The Supreme Court held that, "if the claim is fraud in the inducement of the arbitration clause itself— an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the [Federal Arbitration Act] does not permit the federal

14

A contract is void for fraud in the execution where " ' "the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all." ' " (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415 (*Rosenthal*).)  In this instance, " ' "mutual assent is lacking, and [the contract] is *void*.  In such a case it may be disregarded without the necessity of rescission." ' " (*Ibid.*)  In a fraud in the execution case, "California law . . . requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner.  One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had 'reasonable opportunity to know of the character or essential terms of the proposed contract.' " (*Id.* at p. 423).  Thus, a "party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract."  (*Ibid.*)[11]

---

court to consider claims of fraud in the inducement of the contract generally." (*Id.* at pp. 403-404.)  Further, in *Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, the court rejected a claim of fraud in the execution of an arbitration provision contained in a legal services agreement, holding that the defendants' failure to explain the existence of the arbitration agreement did not "invalidate the arbitration contract." (*Id.* at p. 1309.)  *Mt. Holyoke Homes* provides an example of a court examining whether the arbitration agreement itself was secured through fraud in the execution.

Because the fraud in the execution in this case only extends to the arbitration agreement, our holding below does not affect the validity or enforceability of the English Contract as a whole or any rights Ramos may have under it.

[11] Ramos did not argue fraud in the execution in his Respondent's Brief before us. He did, however, raise this argument, and *Rosenthal* specifically, before the trial court. Prior to oral argument, we issued a focus letter to the parties instructing them to be prepared to address *Rosenthal* and the application of the fraud in the execution doctrine at argument.

15

In *Rosenthal*, various individual investors in stock and bond funds sued a brokerage firm and related bank alleging claims related to the purchase of securities. The defendants moved to compel arbitration of all the plaintiffs' claims. As to the allegations brought by two of the plaintiffs, a mother and daughter with limited English skills, the Supreme Court found that they had alleged facts which, if believed, would support a finding of fraud in the execution of the defendant bank's customer agreement that included an arbitration agreement. The plaintiffs alleged that when they met with the defendant's representative, he began describing the challenged investment. The mother told him that "she could not understand a lot of what he was saying because her English was so poor." (*Rosenthal, supra,* 14 Cal.4th at p. 427.) The plaintiffs allege that the representative instructed the daughter to translate while he read a number of documents to them. According to plaintiffs, the representative never mentioned arbitration. After describing the documents, the bank representative allegedly told the plaintiffs they just needed to sign the documents to open the account and that they just repeated what he had stated. (*Ibid.*)

The Supreme Court held that plaintiffs had alleged sufficient facts to support a finding of fraud in the execution: "In light of plaintiffs' prior relationship with [the bank], their limited ability to understand English, and [the representative's] representations that their oral recitals accurately reflected the terms of the agreements, plaintiffs would not have been negligent in relying on the [the representatives] instead of reading the agreements themselves." (*Rosenthal, supra,* 14 Cal.4th at p. 428.) However, the court recognized that a number of these facts—such as what the representatives actually explained regarding the agreements and the extent to which the various plaintiffs could understand English—were disputed. Accordingly, the Supreme Court remanded the case to the trial court to permit it to resolve these factual disputes. (*Id.* at pp. 428, 430, 431.)

In the instant case, however, the sole factual issue raised by the parties involved the question of which Spanish translation Ramos received. As discussed above, the trial court resolved this factual dispute in favor of Ramos. Beyond this, Ramos's declaration is uncontradicted as Westlake failed to offer any declarations by a witness to the

16

underlying automobile transaction. The only declarations offered by Westlake were authored by John Schwartz, a custodian of records for Westlake with no firsthand knowledge of what occurred when Ramos bought a used automobile from Pena's Motors. Accordingly, there are no disputed facts that need to be resolved.

Under *Rosenthal*, the issue is whether, on these facts, Ramos's reliance on the Ramos Translation was reasonable. We hold that it was. By providing Ramos with a document that purported to be the Spanish translation of the English Contract they were asking him to sign, Pena's Motors implicitly represented to Ramos that it was, in fact, accurate. Ramos was entitled to rely on this representation. The Ramos Translation was not just inaccurate. Rather, it *completely* omitted the arbitration agreement that Westlake now seeks to enforce. By providing Ramos a translation that did not even reference arbitration, let alone translate the terms of the arbitration agreement, Pena's Motors "deprived [Ramos] of a reasonable opportunity to learn the character and essential terms of the [arbitration agreement he] signed." (*Rosenthal*, *supra*, 14 Cal.4th at p. 428.)

Our holding that Ramos's reliance on the Ramos Translation was reasonable is supported by the existence of section 1632. As we detailed above, section 1632 requires merchants to provide translations of certain contracts (including retail installment contracts for automobiles) when those contracts are negotiated primarily in a foreign language. (§ 1632, subd. (b).) The Legislature enacted the statute to "increase consumer information and protections for the state's sizeable and growing Spanish-speaking population." (§ 1632, subd. (a)(1).) The very purpose behind this provision is to ensure that non-English speaking customers receive accurate information regarding the terms and conditions of the contracts they are being asked to sign. Given this, it would be anomalous to hold that Pena's Motors was required to provide Ramos a translation of the English Contract, but that under all of the facts of this case Ramos was not entitled to rely on the accuracy of that translation.

Ramos reasonably relied on a Spanish translation of the English Contract that Pena's Motors provided him and that did not include the arbitration agreement. Accordingly, mutual assent as to the arbitration agreement is lacking, it is void, and the

17

trial court correctly denied Westlake's motion to compel arbitration.  Because of our holding, we need not address the parties' arguments regarding the scope of section 1632's remedies or the trial court's finding that the arbitration agreement was unenforceable due to unconscionability.

**DISPOSITION**

The judgment of the trial court is affirmed.


_____
Miller, J.


We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.

Filed 11/24/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALFREDO RAMOS,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WESTLAKE SERVICES LLC,<br><br>        Defendant and Appellant. | A141353<br><br>(Alameda County<br>Super. Ct. No. RG13682419) |

BY THE COURT:

The opinion in the above-entitled matter filed on October 30, 2015, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

                                                      Richman, Acting P.J.

Trial Court:  Superior Court of Alameda County

Trial Judge:  Hon. Wynne Carvill


Attorney for defendant and appellant          Joshua A. Gratch


Attorneys for plaintiff and respondent        Parviz Darabi
                                               Andrew G. Watters
                                               Dnaiel B. Swerdlin