Filed 3/19/21  Orantes v. Westlake Wellbeing Properties CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ODILIA ORANTES et al., | B295150 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC666337) |
| v. | |
| WESTLAKE WELLBEING PROPERTIES LLC et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  Affirmed.

Stokes Wagner, Peter B. Maretz, Shirley A. Gauvin, and Adam L. Parry, for Defendants and Appellants.

Lavi & Ebrahimian, Joseph Lavi, Jordan D. Bello, and Vincent Granberry, for Plaintiffs and Respondents.

Defendant Westlake Wellbeing Properties, LLC (Westlake) employed plaintiffs Odilia Orantes (Orantes) and Maria Elena Avila Cardona (Cardona) as housekeepers at the Four Seasons Hotel Westlake Village.  Orantes, Cardona, and another former Westlake employee filed a class action complaint alleging wage and hour claims against Westlake, and Westlake moved to compel arbitration as to Orantes and Cardona.  We consider whether the trial court erred in finding the purported arbitration agreements were unenforceable due to fraud in the execution in Orantes's case and uncertain terms in Cardona's case.

## I.  BACKGROUND

### A.  *The Parties*

Westlake is the employing entity for the Four Seasons Hotel in Westlake Village, California.

Orantes was born in Guatemala and moved to the United States in 1988 when she was about 27 years old.  She speaks and reads only "very basic" English, enough to communicate with hotel guests regarding, for example, their need for towels or room cleaning.  When she was hired by Westlake in 2007, her English was even more limited.  Westlake personnel knew her English was limited and, when she was required to sign a document in English, "[s]omeone would translate and give a basic description of the document before [she] would sign it."  Orantes resigned her position with Westlake in 2017.

Cardona was born in Colombia and moved to the United States in 2008 when she was about 36 years old.  She did not speak or read any English when Westlake hired her as a housekeeper in 2012.  English-speaking managers at Westlake knew she did not speak English and relied on other employees to

2

interpret when they needed to speak with her.  Cardona resigned her position with Westlake in 2016.

Orantes, Cardona, and a former colleague, Karla Blanco, filed a class action complaint asserting wage and hour claims against Westlake and affiliated entities in 2017.[1]  This appeal concerns Westlake's motions to compel arbitration as to Orantes and Cardona.

B.    *Westlake's Motions to Compel Arbitration*

In its motions to compel arbitration, Westlake alleged that, as part of the hiring process, Orantes and Cardona each executed an individual employment contract dubbed an "EmPact."[2]  The EmPacts included terms for a mediation and arbitration program given the acronym "C.A.R.E." ("Complaint, Arbitration & Review for Employees").  With its motion to compel arbitration, Westlake submitted unsigned EmPact booklets and signed, one-page EmPact forms for both Orantes and Cardona.  The materials relevant to Orantes are similar, but not identical, to those relevant to Cardona.

Westlake's motion was also accompanied by declarations from Jim Cathcart (Cathcart), its human resources director since

---

[1]    We cannot further describe the nature of the lawsuit because Westlake, the party who has the burden of providing an adequate record, did not include the complaint in its appellate appendix.

[2]    If it is not obvious, "EmPact" is a portmanteau of "employee" and "pact."  The word is accompanied by a service mark symbol in many of the documents we discuss in this opinion.  We omit the service mark when we quote these documents.

3

2010.  The declarations averred an "EmPact is presented to each employee shortly after being hired" and its meaning is "explained to all new hires . . . at the time of their hire."  According to Cathcart, employees are informed arbitration is "not mandatory or a condition of employment."  Cathcart's declarations did not suggest he had personal knowledge of either the specific documents presented to Orantes and Cardona or of how the hiring documents were explained to them.  Rather, he declared only that he found the one-page EmPact forms they appeared to have signed and unsigned EmPact booklets in their personnel files.

As we shall discuss, Orantes and Cardona acknowledged they signed the one-page EmPact forms but denied they had seen the larger EmPact booklet or were told about the document's arbitration provisions.

### 1.     *The Orantes EmPact materials*

Westlake submitted a copy of an EmPact booklet dated August 2006.  The cover includes the phrase "EmPact with" followed by a blank line, which is not filled in.  Following a table of contents, there are 64 numbered pages.  The booklet is written entirely in English.

Page 4 bears the heading "EMPACT" and states, among other things, "The Four Seasons Hotel Westlake Village recognizes my valuable service as an employee, and agrees this __ day of _____, 20__, to provide me with the benefits described in my EmPact.  In return, I, _____ agree to abide by the principles, goals and policies in this EmPact . . . . [¶] . . . [¶]  Our signatures on page 60 of EmPact confirm our mutual agreement to this

4

philosophy, these goals, and all the rights and responsibilities in this EmPact . . . ."  None of the blanks are filled in.

Page 60 also bears the heading "EMPACT."  It includes lines for a manager's and an employee's signature at the bottom. Neither is signed.  Page 61 is a duplicate of page 60, and likewise bears no signatures.  As relevant to this case, the document at pages 60 and 61 of the booklet recites promises by the employee to "[u]se C.A.R.E. first for all complaints even if I have exercised my right to opt out of the mediation/arbitration provisions of C.A.R.E." and, "[u]nless I have exercised my right to opt out, [to] use the mediation/arbitration procedure described in C.A.R.E. as the exclusive method of resolving any dispute I may have relating to termination of my employment (including constructive discharge) and/or claims of employment discrimination, harassment, or wage/hour violations."

The EmPact booklet's discussion of the C.A.R.E. program begins at page 56.  This section begins with a list of six steps for resolving disputes: (1) informal discussion between the employee and his or her immediate supervisor; (2) a written complaint to the human resources office; (3) a human resources investigation; (4) a written decision by the human resources office; (5) an appeal to the general manager; and (6) mediation and arbitration.  The mediation/arbitration step is explained as follows:  "If I am not satisfied with the General Manager's written decision in STEP 5, and the complaint is based on one of the following types of claims as defined by law: [¶] a. employment discrimination; [¶] b. harassment as it relates to my employment; [¶] c. a wage or hour violation; ¶ d. or termination of my employment from Hotel (including 'constructive discharge,' but not a permanent layoff); [¶] then I must submit my complaint to be heard by an

5

independent mediator/arbitrator unless I have chosen to opt out of the mediation/arbitration provisions by following the opt-out procedure provided on page 63."

The "OPT-OUT VERIFICATION" form at page 63 explains the opt-out procedure, which includes signing and returning the form to Westlake's director of human resources, and states that doing so will render the employee ineligible for no-fault separation pay and "any of the other monetary or non-monetary benefits available to employees who choose to be bound by the mediation/arbitration provisions of C.A.R.E." The signature lines on this page are blank.

After listing the six steps of the C.A.R.E. process, the C.A.R.E. section of the EmPact booklet includes 13 paragraphs discussing mediation and arbitration. These span three pages, from page 56 through page 58. Each paragraph begins with an underlined phrase, but there is no emphasis of any other text.

Paragraph Two, on page 57, begins with the underlined question, "What is Mediation/Arbitration?" It explains disputes will be referred to non-binding mediation and then, if necessary, binding arbitration administered by the American Arbitration Association (AAA) (or another agency if the employee and Westlake both agree) pursuant to AAA rules.[3] Paragraph Four, on the same page, reiterates arbitration will be "final and binding." Paragraph 8, on page 58, begins with the underlined phrase, "Waiver of Right to Go to Court" and expressly states, for the first time, that an employee who does not opt out of C.A.R.E.

---

[3]     Paragraph Two ends with a notice that a copy of the AAA rules may be found at www.adr.org.

6

"waive[s] [their] right to have [their] case submitted to a court of law and decided by a judge or jury."

In addition to the unsigned EmPact booklet, Westlake submitted with its motion to compel arbitration a one-page form, also titled "EMPACT," bearing Orantes's signature. A portion of the form is similar in substance to unsigned signature pages in the booklet we have already mentioned (pages 60-61), but the form is not identical to any page in the booklet and it does not bear a page number. In other words, there is no indication the signed one-page form was taken from the larger EmPact booklet Cathcart found in Orantes's personnel file. Like the booklet, the one-page form is written in English only.

The one-page EmPact form is printed in horizontal or landscape orientation and includes two columns of text. The first column begins with a paragraph which states, in part, "I Odilia Orantes agree to abide by the principles, goals and policies in this EmPact." The remainder of the first column is a list of "principles" and a list of "goals," neither of which mentions arbitration. The second column bears the heading "EmPact SUMMARY AND UNDERSTANDING" followed by a list of promises by the employee and by Westlake. The employee promises to: "Abide by Four Seasons Hotel Westlake Village goals and standards; [¶] Accept[ ] my compensation and benefits; [¶] Us[e] C.A.R.E. first for all complaints even if I have exercised my right to opt out of the arbitration provisions of C.A.R.E; and [¶] Unless I have exercised my right to opt out, using the arbitration procedure described in C.A.R.E. as the exclusive method of resolving any dispute I may have related to termination of my employment (including constructive discharge) and/or claims of employment discrimination or harassment . . . ."

The one-page form is signed by Orantes and a Westlake regional vice president and general manager.  In a declaration filed in support of her opposition to Westlake's motion, Orantes acknowledged her signature on the one-page EmPact form, but stated Westlake knew she could not read it in English and it was described to her as an agreement not to share hotel guests' confidential information.  She denied ever having seen the larger EmPact booklet in Spanish or English.[4]

### 2. *The Cardona EmPact materials*

Unlike the EmPact booklet Westlake submitted as to Orantes (dated 2006), which included a cover page with a blank space for Orantes's name, the EmPact booklet Westlake submitted as to Cardona (dated 2008) does not include a cover page.  Like the Orantes EmPact booklet, the Cardona EmPact booklet is written entirely in English.  It includes 65 numbered pages.

Similar to the Orantes EmPact booklet, page four of the Cardona EmPact booklet bears the heading "EMPACT" and includes a promise that "I, _____ agree to abide by the principles, goals and policies in this EmPact. . . . [¶] . . . [¶]  Our signatures on page 61 of EmPact confirm our mutual agreement to this philosophy, these goals, and all the rights and responsibilities in this EmPact . . . ."  As with Orantes, none of the blanks are filled

---

[4]     Westlake contends, for the first time in its reply brief, that Orantes and Cardona's declarations are inadmissible because they were written in English and orally interpreted for Orantes and Cardona before they signed.  Westlake forfeited this argument by failing to raise it in its opening brief.  (*Safeway Wage & Hour Cases* (2019) 43 Cal.App.5th 665, 687, fn. 9.)

in.  Also similar to Orantes, the signatures contemplated on page 61 (and duplicate page 63) do not exist.

The Cardona EmPact booklet's discussion of the C.A.R.E. program begins at page 57.  Like the Orantes EmPact booklet, this section lists the C.A.R.E. program's six steps followed by more than a dozen numbered paragraphs across three pages discussing mediation and arbitration.  (The Orantes EmPact booklet includes 13 paragraphs concerning mediation and arbitration; the Cardona booklet adds a paragraph purporting to waive the employee's right to participate in a class or collective action.)  As in the Orantes booklet, the first express statement that employees who do not opt out of the arbitration provision waive their right to go to court appears in the eighth paragraph. Also like the Orantes booklet, the C.A.R.E. section refers to a subsequent page setting forth the opt-out procedure and cautioning that employees who opt out of mediation and arbitration forfeit no-fault separation pay and other benefits.

The signed, one-page EmPact form for Cardona is written in Spanish.  Like the one-page form for Orantes, it is a landscape-oriented, two-column document with no page numbering that bears the title "EMPACT."  It is signed by Cardona and a general manager.  The one-page form states "[o]ur signatures on page 68 of the EmPact confirm our mutual agreement to this philosophy, objectives and to all rights and obligations included in this EmPact contract . . . ."  The EmPact booklet Westlake submitted for Cardona does not include a page 68.

The signed, one-page EmPact form's only mention of the employee's agreement to mediation and arbitration falls within a paragraph beginning at the bottom of the first column and continuing to the second:  "I have read this EmPact and agree: [¶]

to comply with the objectives and regulations of the Four Seasons Hotel Westlake Village; to accept the compensation and the benefits that correspond to me; to use the C.A.R.E. system first for all my complaints, even if I have exercised my right to exclude C.A.R.E.'s mediation/arbitration clauses; and, unless I have exercised my exclusion right, to use the mediation and arbitration procedure described in C.A.R.E. as the exclusive method to solve all disputes that I may have regarding the termination of my employment (including forced resignation) and/or claims due to discrimination at the workplace, hostility or breach of salary or schedule."[5]  There are no line breaks, bullet points, or emphasis in this paragraph.

Notwithstanding references to numbered pages that are not attached to it, Cardona's one-page EmPact form does not incorporate the EmPact booklet or any other document by reference.  The one-page form includes an integration clause stating the "EmPact constitutes the entirety of the agreement between the Four Seasons Westlake Village and me . . . ."

In a declaration submitted in support of her opposition to Westlake's motion, Cardona acknowledged her signature on the one-page EmPact form, but denied having seen the EmPact booklet.  She recalled being told that she was required to sign the one-page form as a condition of her employment.

---

[5]  Westlake had the Spanish document signed by Cardona translated for purposes of this litigation.

C. *The Trial Court's Order Declining to Compel Arbitration*

The trial court denied Westlake's motions as to both Orantes and Cardona. Preliminarily, the trial court found the Federal Arbitration Act (9 U.S.C. § 2 et seq.) (FAA) did not govern its analysis because Westlake did not satisfy its burden to demonstrate the requisite connection to interstate commerce. The trial court then found that neither employee entered into an enforceable agreement to arbitrate their claims against Westlake.

As to Orantes, the trial court held the signed one-page EmPact form did not reflect a meeting of the minds as to arbitration because it was undisputed Orantes could not read the document and relied on a description that did not mention arbitration. Cathcart's assertion that the EmPact documents were correctly explained to her, the court found, was not based on personal knowledge. As to Cardona, the trial court concluded there was no evidence that she ever received the unsigned EmPact booklet and, standing alone, the signed one-page EmPact form was no more than an "agreement to agree." The trial court emphasized, in particular, the one-page form's representation that "[o]ur signatures on page 68 of the EmPact [booklet] confirm our mutual agreement" and Westlake's failure to furnish these signatures. As with Orantes, the court disregarded Cathcart's statement that the agreement was explained to her because it was not based on personal knowledge.

As an alternative ground for denying Westlake's motions, the trial court found the purported arbitration agreements were unconscionable. The trial court determined there was procedural unconscionability because, notwithstanding employees' right to opt out of arbitration, the EmPact booklets describing the

11

material terms of the agreements are entirely in English and there was no evidence either employee received a copy of the AAA rules that would govern arbitration.  The trial court found the agreements to be substantively unconscionable because, notwithstanding the mutual obligation to arbitrate disputes, the agreement extended only to claims employees were likely to bring against Westlake.  The trial court also found that the pre-mediation C.A.R.E. steps give Westlake a "free peek" at employees' claims and the arbitration rules give the arbitrator mere discretion to award fees that a prevailing party would be automatically entitled to under the Labor Code.

## II.  DISCUSSION

The trial court correctly determined Orantes and Cardona did not enter into an enforceable agreement to arbitrate their claims against Westlake.  As we shall discuss, the trial court's well-founded concerns about the description of the one-page EmPact form provided to Orantes that did not mention arbitration are properly analyzed as fraud in the execution of the agreement.  As to Cardona, where the trial court focused primarily on the form's indication there would be signatures on the separate booklet, we agree there was a lack of certainty regarding a promise to arbitrate pursuant to the procedure "described in C.A.R.E." because the one-page EmPact form does not define C.A.R.E. and does not incorporate any other document by reference.  Because we affirm the order on these grounds, we do not address the trial court's alternative holding that the purported agreements are unconscionable.

12

*A.    Applicable Law*

"Generally, the first step in reviewing an arbitration dispute is to determine whether the question presented is subject to the FAA or the [California Arbitration Act (Code Civ. Proc., § 1280 et seq.)] because different rules apply under the two acts, which in some cases leads to federal preemption." (*Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 391.)  The "party seeking to enforce an arbitration agreement has the burden of showing FAA preemption.  [Citation.]  For example, a petitioner seeking an order to compel arbitration must show that the subject matter of the agreement involves interstate commerce." (*Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 687-688.)  Westlake contends the FAA preempts state law in this case because Four Seasons "operate[s] properties nationally and internationally and serve[s] guests from around the world."  No record citation accompanies this assertion, however, and we see no such admissible evidence in the record.

Regardless, the choice of law question is irrelevant for our purposes.  Even if Westlake's bare assertion were sufficient to establish that the purported agreements implicate interstate commerce and must be construed according to the FAA, this appeal raises a more fundamental issue—i.e., whether the purported agreements are enforceable.  The issue of FAA preemption does not impact our analysis of this threshold question because "we apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute.  [Citations.]" (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60 (*Avery*); *Banner Entertainment, Inc. v. Superior Court* (1998) 62

13

Cal.App.4th 348, 357 ["the FAA does not apply until the existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation and enforcement of contracts generally"]; see also *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246 (*Pinnacle*).)

## B.     The Purported Arbitration Agreements Are Not Enforceable

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy *if it determines that an agreement to arbitrate the controversy exists*" (absent certain exceptions not at issue here).  (Code Civ. Proc., § 1281.2, emphasis added.)  Although California public policy strongly favors arbitration and any doubts about the *scope* of an arbitration agreement must be resolved in favor of arbitration (*EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320), the public policy favoring arbitration does not arise until an enforceable agreement is established.  (*Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 892; accord *Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1505 ["There is no public policy in favor of forcing arbitration of issues the parties have not agreed to arbitrate"].)  "In California, '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' [Citation.]" (*Pinnacle, supra*, 55 Cal.4th at 236.)

14

*1.    Orantes*

The trial court found Orantes did not manifest her consent to arbitration because the one-page EmPact form she signed was in English, Westlake's managers knew she could not read the document, and she relied on a description of the document by Westlake that did not mention arbitration.

As a general matter, a party that fails to read or is unable to read an agreement the party signs may still be bound by that agreement.  (See, e.g., *Pinnacle*, *supra*, 55 Cal.4th at 236 ["An arbitration clause within a contract may be binding on a party even if the party never actually read the clause"]; *Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 687 ["the fact that [a party] signed a contract in a language he may not have completely understood [does] not bar enforcement of the arbitration agreement"] (*Ramos*); *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163 ["As Mr. Witkin states:  'Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it.  If he cannot read, he should have it read or explained to him'"].)

The general rule does not apply, however, when one party to an agreement reasonably relies on the other to describe the contract and material terms are omitted.  For example, in *Ramos*, *supra*, 242 Cal.App.4th 674, the Court of Appeal considered whether a Spanish-speaking consumer was bound by an arbitration provision in an English sales contract when the seller presented the consumer with a purported Spanish translation that omitted the arbitration provision.  (*Id*. at 686-687.)  The Court of Appeal held the defective translation amounted to fraud

15

in the execution of the document and concluded the arbitration provision was unenforceable for lack of mutual consent. (*Id*. at 687-688 ["A contract is void for fraud in the execution where ""the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all""""]; see also *Rosencrans v. Dover Images, Ltd*. (2011) 192 Cal.App.4th 1072, 1080 ["'Fraud in the execution' means that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all; since mutual assent is lacking, the contract is void"].)

"In a fraud in the execution case, 'California law . . . requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent[ ] if the second party had "reasonable opportunity to know of the character or essential terms of the proposed contract."' ([*Rosenthal v. Great Western Fin. Securities Corp*. (1996) 14 Cal.4th 394,] 423 [(*Rosenthal*)] . . . .) Thus, a 'party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract.' (*Ibid*.)" (*Ramos, supra*, 242 Cal.App.4th at 688-689.)

There was no such unreasonable reliance here. The trial court found, appropriately based on substantial evidence, that

16

Westlake asked Orantes to execute the one-page EmPact form in a language managers knew she did not understand and provided a "basic description" of the form that mentioned only her obligation not to disclose guests' confidential information.[6] While this "basic description" presumably did not purport to be a verbatim translation, it was nonetheless reasonable for Orantes to rely on her employer to mention all the highlights, like an agreement to arbitrate disputes. (See *Rosenthal*, *supra*, 14 Cal.4th 394, 428 [if credited, testimony of a non-English-speaking plaintiff whose daughter translated salesperson's recitation of contract terms as he "glanced over" document sufficient to establish reasonable reliance for purposes of fraud defense].)

Westlake contends, however, that the trial court improperly excluded Cathcart's testimony that "EmPact and its meaning are explained to all new hires at Westlake at the time of their hire," including the arbitration provision. Although Cathcart did not work for Westlake when Orantes was hired, Westlake contends his testimony regarding the circumstances of her execution of the one-page EmPact form is admissible under the business records exception to the hearsay rule. (Evid. Code, § 1271.)

The argument fails because Cathcart's declaration is not itself a business record. (Evid. Code, § 1271 [defining a business record as "a writing made as a record of an act, condition, or event" that was (a) "made in the regular course of a business" and

---

[6] Westlake suggests Orantes's claim that she could not read the one-page EmPact form is contradicted by the form's statement that "I have read EmPact." It hardly needs to be said that a statement *in English* is not probative of Orantes's ability to understand English.

17

(b) "made at or near the time of the act, condition, or event"].) Westlake's argument rests on the premise that a custodian is free to expound on any matter relevant to the preparation of a specific document regardless of a lack of personal knowledge simply because a custodian of a business record must testify to its identity and the mode of its preparation for the exception to apply.  (Evid. Code, § 1271, subd. (c).)  The premise is wrong; that is not how the business record exception works.  The fact that a custodian "need not have been present at every transaction to establish the business records exception" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322) does not mean they need not have been present to testify about the circumstances of a particular transaction.  (See Evid. Code, § 702, subd. (a) [in general, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter"].)

Westlake also contends Orantes's account is inadmissible under the parol evidence rule.  This argument is raised for the first time in Westlake's reply brief and therefore forfeited.  It is also meritless.  The parol evidence rule provides that the "[t]erms set forth in a writing intended by the parties as a final expression of their agreement . . . may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement" (Code Civ. Proc., § 1856, subd. (a)), but it "does not exclude other evidence of the circumstances under which the agreement was made . . . or to establish illegality or fraud" (Code Civ. Proc., § 1856, subd. (g)).  Orantes's declaration does not impermissibly suggest an oral modification of the one-page EmPact form.  Rather, it establishes that she reasonably relied on Westlake's inaccurate, or at least materially incomplete, representation of the form's terms.

18

### 2. *Cardona*

Although Cardona was able to read the one-page EmPact form she signed, the trial court ruled this form, standing alone, did not create an enforceable agreement to arbitrate.

"'Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached.' [Citation.] 'To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' [Citations.] 'Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.' [Citations.] 'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.' [Citations.]" (*Bustamante v. Intuit, Inc*. (2006) 141 Cal.App.4th 199, 209.)

The one-page EmPact form that Cardona executed states "[o]ur signatures on page 68 of the EmPact confirm our mutual agreement to this philosophy, objectives and to all rights and obligations included in this EmPact contract . . . ." As we have already discussed, Cardona denies having received the EmPact booklet and all of the signature lines in the booklet are blank. In fact, the booklet does not even have a page 68. If the one-page EmPact form said nothing else, we would need to say no more to conclude the form is an unenforceable agreement to agree. (*Reeder v. Specialized Loan Servicing LLC* (2020) 52 Cal.App.5th 795, 803 ["'Preliminary negotiations or agreements for future

negotiations—so-called agreements to agree—are not enforceable contracts'"].)

The one-page EmPact form also includes, however, affirmative promises by the employee:  "I have read the EmPact contract and agree: . . . to use the C.A.R.E. system first for all my complaints, even if I have exercised my right to exclude C.A.R.E.'s mediation/arbitration clauses[,] and, unless I have opted out, to use the mediation and arbitration procedure described in C.A.R.E. as the exclusive method to solve all disputes that I may have regarding the termination of my employment (including forced resignation) and/or claims due to discrimination at the workplace, hostility or breach of salary or schedule."  The problem, however, is this adds nothing meaningful.

The one-page EmPact form, itself titled "EMPACT," does not define the C.A.R.E. procedures.  Nor does the one-page EmPact form mention the EmPact booklet—much less incorporate the booklet's explanation of the C.A.R.E. procedures by reference.  Notwithstanding Cathcart's inadmissible assertion to the contrary,[7] it is undisputed Cardona received and signed only the one-page EmPact form.  The bottom line is the one-page EmPact form is not sufficiently definite to enable us to determine the scope of the promise and to devise an appropriate remedy.  "A petition to compel arbitration is simply a suit in equity seeking specific performance of a contract" (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890), and a promise to use the

---

[7]     Although Cathcart worked for Westlake when Cardona was hired, he states no basis for personal knowledge of which documents were presented to her.

"arbitration procedure described in C.A.R.E.," without more, is not specifically enforceable.[8] (*Avery, supra*, 218 Cal.App.4th at 68 ["[I]t is not sufficient for the party seeking to compel arbitration to show the parties generally agreed to arbitrate their disputes by incorporating some arbitration provision into their contract. Rather, the party must establish the precise arbitration provision the parties incorporated into their agreement to govern their disputes"].)

---

[8] Westlake's contention that a C.A.R.E. arbitration provision has been enforced when the one-page EmPact form was included *within* the EmPact booklet is factually inapposite. (*Rodriguez v. Four Seasons Hotels, Ltd.* (S.D.N.Y. July 10, 2009, No. 09 Civ. 2864) 2009 WL 2001328, *4 [enforcing C.A.R.E. arbitration provision where the plaintiff employee contended he could not "be found to have agreed to arbitrate because the arbitration clause was in a 'booklet' that was not identified anywhere, *including on the signature page*, as an employment contract"], emphasis added.)

## DISPOSITION

The trial court's order denying Westlake's motions to compel arbitration is affirmed.  Orantes and Cardona shall recover their costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


MOOR, J.