Filed 1/19/22 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LUIS MUNOZ et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PL HOTEL GROUP, LLC, et al., <br><br> Defendants and Respondents. | D078215 <br><br> (Super. Ct. No. 37-2019-00017904-CU-FR-CTL) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed January 3, 2022 be modified as follows:

On page 8, at the end of the top paragraph, after the words "does not preclude relief," add as footnote 6 the following footnote, which will require renumbering of all subsequent footnotes:

> 6    In a petition for rehearing, Inn Lending and Rajesh cite Government Code section 68081, contending rehearing should be granted because fraud in the execution was a new issue not raised below or briefed on appeal.  We disagree.  The Complaint specifically alleges defendants "intentionally deceived Plaintiffs into executing the [lease] *thereby committing fraud in the execution*."  (Italics added.) Moreover, opposing the demurrer in the trial court, Munoz

asserted that "[t]he Patel Defendants . . . tricked [him] into executing an altered lease."  His points and authorities cited *California Trust, supra*, 214 Cal. 619 for the proposition that courts grant relief where one is "induced by fraud or trickery" to sign a contract "that differs from the alleged terms . . . ."  On appeal, the opening brief asserts that the demurrer should have been overruled because of "fraud or trickery" involving "a contract that differs from the agreed terms."  The reply brief elaborates, asserting the "bait and switch" involving the promised lease (bait) for the executed one (switch) "are sufficient to state a cause of action for fraud."  Accordingly, the fraud-in-the-execution theory was " 'fairly encompassed' " within the main issues at all relevant stages.  (See *Church Mutual Ins. Co., S.I. v. GuideOne Specialty Mutual Ins. Co.* (2021) 72 Cal.App.5th 1042, 1055, fn. 2.)

The petition for rehearing is denied.

There is no change in judgment.

HALLER, Acting P. J.

Copies to:  All parties

Filed 1/3/22 (unmodified opinion)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LUIS MUNOZ et al., | D078215 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2019-00017904-CU-FR-CTL) |
| PL HOTEL GROUP, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Reversed.

Spierer, Woodward, Corbalis & Goldberg and Stephen B. Goldberg for Plaintiffs and Appellants.

Bradley L. Jacobs for Defendants and Respondents.

This appeal involves a form of fraud rarely seen in day to day litigation. It goes by various names—fraud in the factum, fraud in the execution, fraud in the inception—but they all describe the same genre of deceit. It occurs where, after parties have agreed upon certain contract terms, one of them surreptitiously substitutes a document for signature that looks the same as the earlier draft but contains materially different terms. Fraud in the

execution is distinct from promissory fraud, which involves false representations that induce one to enter into a contract containing agreed-upon terms.

This case, on appeal after a demurrer was sustained without leave to amend, involves the purchase and leaseback of a vacant hotel and restaurant. The nub of the lawsuit is the buyers'/plaintiffs' claim that the sellers/defendants surreptitiously substituted altered versions of the lease and financing instruments containing terms extremely adverse to the buyers, and which they allege were neither bargained for nor agreed to.

As we explain, these allegations state, quite literally, a textbook cause of action for fraud in the execution, as this illustration from the Restatement Second of Contracts demonstrates:

> "A and B reach an understanding that they will execute a written contract containing terms on which they have agreed.  It is properly prepared and is read by B, but A substitutes a writing containing essential terms that are different from those agreed upon and thereby induces B to sign it in the belief that it is the one he has read.  B's apparent manifestation of assent is not effective."  (Rest.2d, Contracts (1981) § 163, illus. 2.)

But acting under the misapprehension that plaintiffs' theory was *promissory* fraud, the superior court sustained a demurrer brought by defendants Inn Lending LLC (Inn Lending) and Rajesh Patel (Rajesh) on the grounds that "[i]nsufficient facts" were alleged showing they "made promises" upon which plaintiffs relied.  The court also determined that related causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and financial elder abuse also failed.  We reverse the resulting judgment of dismissal.

2

FACTUAL AND PROCEDURAL BACKGROUND[1]

Shivam Patel and his son, Rajesh (collectively, the Patels), owned a hotel and restaurant (Hotel). The Hotel had been closed for years and the property needed substantial repairs. When renovations were about half completed, the Patels determined the project was not viable because "there was no way to get conventional financing with a half-finished Hotel that had no financial history."

The Patels formed PL Hotel Group, LLC (PL) to hold title and listed the property for sale. They structured the transaction to remain in possession after the sale. Toward that end, the sale included a leaseback to the Patels under a triple net lease.[2] From the buyer/landlord's perspective, the difference between the monthly rent under the lease and cost of financing would be the return on investment.

Luis Munoz is an 80-year-old real estate investor and sole owner of LR Munoz Real Estate Holdings, LLC (collectively, Munoz). In June 2018, the Patels' agent, Steven Davis, sent an offering memorandum to Munoz's agent, Ryan Cassidy.[3] Among other terms, it stated the transaction would include a "[n]ew 20-year absolute NNN [l]ease" to start at close of escrow.

In early July, the parties agreed on a $2.8 million purchase price. Cassidy drafted the purchase agreement, under which the Patels were to

---

[1] The factual background is from the allegations of the Complaint, which are assumed true in reviewing an order sustaining a demurrer. (See *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395.)

[2] A triple net lease (sometimes designated by the parties here as NNN) is one in which the lessee pays taxes, insurance, and utilities. (See *Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1450; 2A Miller & Starr, Cal. Real Est. Forms (2d ed. 2020) § 2:28.)

[3] All dates are in 2018 unless otherwise specified.

3

provide Munoz a "fully executed lease that should include an annual rent payment of $230,000 NNN paid monthly . . . ."[4]

On July 17, the Patels (via Davis) sent a proposed but unexecuted triple net lease to Cassidy. In an accompanying e-mail, Davis reserved the Patels' right to "make further edits in case there was an error or oversight." This lease, which the parties refer to as the "July 17 lease," was circulated "multiple times" during the 60-day escrow. It was the only lease agreement ever circulated before close of escrow. It contained the agreed lease terms, and at no time before escrow closed did the Patels ever contend there was an "error or oversight" in it.

The July 17 lease was for a 20 year term, with specified options to renew. Rent began at $19,167 per month, and periodically increased over the 20 year term. The tenants (Patels) were solely responsible for (1) maintenance and repairs; (2) insurance; (3) utilities; and (4) taxes.

On August 29, Davis sent an e-mail to Cassidy attaching the July 17 lease, indicating it is the version that "will be signed at closing." On September 13 (two days after escrow closed), Shivam sent an e-mail to Cassidy stating, "Attached is the lease," thus making it appear he had signed the July 17 lease. But the September 13 lease attached to Shivam's e-mail was materially different.

Unfortunately for Munoz, the differences between the two leases "were not so numerous to be obvious." For instance, the provision a landlord might be expected to check—rent payments—was unchanged. Munoz signed the September 13 lease after only a cursory review, believing it was the same triple-net lease the parties had circulated and approved numerous times.

---

[4] The lease was expected to yield about an eight percent return on Munoz's investment.

4

But as Munoz would soon learn, the September 13 lease was anything but a triple net lease.  For example:

- *Maintenance and Repair*:  Under the July 17 lease, the landlord (Munoz) has no obligation to maintain or repair the premises.  But the September 13 lease provides the landlord "shall have the duty to repair" everything beyond normal wear and tear.

- *Renovations*:  Under the July 17 lease, the tenant (Patels) were obligated to complete renovations.  Under the September 13 lease, the landlord is.

- *Taxes*:  The July 17 lease provides the tenant pays taxes relating to the premises.  The September 13 lease limits that obligation to taxes "attributable solely to any business property or personal property of the Tenant" on the premises.

- *Assignment and Subletting*:  The July 17 lease allows the tenant to sublease to a nonaffiliated entity only with the landlord's consent.  The September 13 lease allows a sublease "without Landlord's consent at any time."

- *Tenant's Continuing Liability:*  Under the July 17 lease, an assignment or sublease does not release tenant's liability, including for rent.  But under the September 13 lease, a permitted assignment or sublease "eliminate[s]" tenants' liability.

- *Landlord's Remedy:*  The September 13 lease adds a new provision that makes retaking possession the landlord's *sole* remedy on tenant's default.

Meanwhile, as the Patels' plan with regard to the altered lease was put in place, Munoz was unable to obtain financing from a conventional lender because the Hotel had been closed for two years.  Expecting this, the Patels initiated the second phase of their plan.  Not only would they be the seller/tenant in the transaction, but also the secured lender.

On the Patels' behalf, Davis contacted Cassidy (Munoz's agent) and recommend he hire David Hamilton of Pacific Southwest Realty Services (collectively, Hamilton) as loan broker.  But this was all an illusion for Munoz's consumption.  Hamilton had no intention of shopping around for a

5

loan. Instead, he placed the loan with Inn Lending—an alter ego entity of the Patels created just for this purpose.

On July 25, Hamilton told Munoz that a private lender, Inn Lending, would finance the purchase at six percent per annum interest, secured by a deed of trust *only* on the Hotel (plus an *unsecured* personal guarantee by Munoz). These terms were presented in an August 6 "letter of intent" Munoz signed. Munoz paid Hamilton a $7,500 "administrative" fee to have loan documents drawn on those terms. During this whole time, Inn Lending did not even exist. It was "simply Rajesh and Shivam."

Inn Lending did not come into existence until August 23. The next day, Hamilton sent loan documents to Munoz. In a sense, it was deja vu. Like the leaseback, the loan was another bait and switch. The approximately 300 pages of loan documents materially varied from the letter of intent:

- The interest rate was "disguised" and was actually 7.3 percent;
- The payoff amount was $300,000 more than it should have been;
- The loan was secured not only by the Hotel, but also by Munoz's other real estate holdings "worth several millions of dollars" and a security interest in his personal property.

On September 4, Munoz signed the loan documents, unaware of these changes. For the Patels, everything was now in place. They "always intended to surreptitiously alter the lease knowing that the real estate agents would cooperate and/or would not be diligent enough to catch the fraud." The transaction was manipulated to make sure "it would be so burdensome and unfair" that Munoz would quickly default on his loan, allowing the Patels, through Inn Lending, to foreclose on not only the Hotel, but also Munoz's other real property.

It took less than a month for the other shoe to drop. On October 1, Munoz asked the Patels for the first rent check. In response, Shivam claimed

6

no rent was due, stating, "The landlord is supposed to reimburse the Tenant for all renovation costs." Three weeks later, PL's attorney demanded Munoz reimburse for all renovation expenses. Not surprisingly, this litigation ensued.

In November, Munoz filed a superior court complaint against the Patels, Inn Lending, and others. After demurrers to the original and later the first amended complaint were sustained with leave to amend, in December 2019 Munoz filed the operative Complaint. Against Rajesh and/or Inn Lending, Munoz alleged causes of action for: breach of contract ; elder financial abuse ; "promissory fraud" ; and breach of the implied covenant of good faith and fair dealing.

Rajesh and Inn Lending demurred again, asserting they were "in no way involved in the underlying transaction and/or in negotiating the terms of the sale/lease . . . ." They claimed the fraud cause of action failed because "as to Rajesh, there are zero allegations . . . [that he] even spoke to Munoz, let alone make any representations to him . . . ." And they asserted there was "no authority to support the proposition that revisions to documents by one party . . . can equate to affirmative misrepresentations that could give rise to liability for fraud . . . ."[5]

Opposing the demurrer, Munoz's attorney argued, among other theories, that the defendants "misconstrue[d] the allegations" and the Complaint alleged the Patels "tricked [Munoz] into executing an altered lease." Citing among other authorities, *California Trust Co. v. Cohn* (1932) 214 Cal. 619 (*California Trust*), they maintained that Munoz's failure to read

---

[5] Shivam and PL also demurred; however, the court overruled it in part and they are not parties to this appeal.

7

the lease before signing, if "induced by fraud or trickery," does not preclude relief.

After conducting a hearing, the court sustained the demurrer without leave to amend and entered a judgment of dismissal in favor of Rajesh and Inn Lending. Postjudgment, the court awarded them $92,505 in attorney's fees plus costs.

DISCUSSION

A. *The Court Erroneously Sustained the Demurrer to the Fraud Cause of Action.*

In sustaining the demurrer to the seventh cause of action, the trial court understood it to involve promissory fraud. This was probably in no small part because Munoz's attorney labeled it "Promissory Fraud." The court explained the Complaint was insufficient because there were no allegations that Rajesh or Inn lending "made promises," nor allegations "as to the element of reliance."

However, "The nature and character of a pleading is to be determined from the *facts alleged,* not the name given by the pleader to the cause of action." (*Ananda Church of Self-Realization v. Massachusetts Bay Ins. Co.* (2002) 95 Cal.App.4th 1273, 1281.) The gravamen of the fraud claim is not fraud in the inducement, but rather fraud in the execution.[6]

_____

[6] That said, the manner in which the Complaint was drafted appears largely responsible for the misapprehension. Despite alleging facts constituting fraud in the execution, the seventh cause of action is captioned, "Promissory Fraud." Moreover, a key allegation that defendants committed "fraud in the execution" is buried in paragraph 88. It becomes part of the fraud cause of action only by being incorporated by reference along with 184 other paragraphs.

There are good reasons why a complaint is supposed to contain a "statement of the facts constituting the cause of action, in ordinary and

In the classic case of fraud in the execution, some limitation—such as blindness, illness, or illiteracy—prevents the plaintiff from reading and understanding the contract that he or she is about to sign. (See, e.g*., Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 427–428 (*Rosenthal*) [defendants omitted portions of the contract when reading it aloud to plaintiff, who could not read English]; *Erickson v. Bohne* (1955) 130 Cal.App.2d 553, 554–557 [plaintiff's daughter took advantage of her physical and mental illness by tricking her into signing a deed]; *Jones v. Adams Financial Services* (1999) 71 Cal.App.4th 831, 835–840 [defendants tricked an elderly legally blind woman into a reverse mortgage by telling her she was authorizing them to learn the payoff on her mortgage].)

Closer to the facts alleged here, fraud in the execution may also occur where a contract is surreptitiously modified. In *Hotels Nevada v. L.A. Pacific Center, Inc.* (2006) 144 Cal.App.4th 754, for example, the owner of commercial property signed an agreement to sell the properties for $70 million in cash and another $5 million a year later. He alleged that after he signed the agreement, the buyers covertly substituted a provision entitling them to hold back the last $5 million for five years instead of one. The court held those allegations sufficed for fraud in the execution. (*Id.* at p. 764.)

Another variation is typified by *California Trust*, a case Munoz cited in his opposition to the demurrer. There, when the plaintiff sued to quiet title to certain real property, the defendants cross-complained alleging fraud in

---

concise language." (Code Civ. Proc., § 425.10, subd. (a)(1).) This one does not, and as a result opposing counsel and the trial court were largely left on their own to determine which of the 202 paragraphs were actually germane to each legal theory pleaded. That task was also considerably more difficult and time-consuming than it should have been on appeal—the statement of facts in the opening brief is less than two pages, and cites to just 14 of the Complaint's 202 paragraphs.

the execution. (*California Trust*, *supra*, 214 Cal. at p. 622.) According to the cross-complaint, the plaintiff represented that if defendants paid $7,500, he would hold title to the property, improve and sell it within a year, and pay the defendants $17,500 of the proceeds. The plaintiff prepared a written agreement and stated it contained these provisions, which defendants signed without reading it. (*Id.* at p. 623.) When the plaintiff demanded further payment, they read it for the first time and discovered it contained provisions significantly different from the prior oral agreement. (*Id.* at pp. 623–624.) The Supreme Court determined the cross-complaint alleged sufficient facts to warrant reformation, commenting, "[A] party to an instrument who by fraud leads the other party to sign without reading it is in no position to urge the latter's negligence . . . ." (*Id.* at p. 627.)

Other like cases from outside California include *Hetchkop v. Woodlawn at Grassmere, Inc.* (2nd Cir. 1997) 116 F.3d 28, where a union secretly substituted one document for another while an employee's back was turned. And in another labor case, *Connors v. Fawn Mining Corp.* (3d Cir. 1994) 30 F.3d 483, an employer signed a collective bargaining agreement that contained materially different terms than had been promised by the union. There, the Third Circuit observed that fraud in the execution occurs where one party "surreptitiously substitutes a materially different contract document before both sides execute it." (*Id* at p. 493.) The Ninth Circuit reached the same conclusion in *Operating Engineers Pension Trust v. Gilliam* (9th Cir. 1984) 737 F.2d 1501. There, an employer was led to believe he was signing a standard union membership form. Based upon that he "did not read the documents" but merely relied on the union representative's word. The Court of Appeals concluded, "he who signs a document reasonably

believing it is something quite different than it is cannot be bound to the terms of the document." (*Id.* at p. 1504.)

And finally, on facts not too dissimilar to those alleged by Munoz here, in *Settlers' Hous. Serv. v. Schaumburg Bank & Trust Co., N.A.* (Bankr. N.D.Ill. 2017) 568 B.R. 40, the debtor alleged fraud in the execution based on claims that bank officers surreptitiously included within a large pile of documents he signed a note for a line of credit secured by debtor's property. The court disallowed that portion of the creditor's claim, noting that a signature procured by fraud in the execution gave no more effect to a contract than one that had been forged. (*Id.* at pp. 65–67.) According to the bankruptcy court, that a more cautious person "might have smelled a rat, does not defeat liability."[7] (*Settlers' Hous. Serv.,* at p. 67.)

These cases reflect society's understandable desire to repress this pernicious form of fraud. Yet at the same time, there has "always been a sharp struggle" between that policy "upon the one hand, and on the other to discourage negligence and the opportunity and invitation to commit perjury." (*California Trust, supra,* 214 Cal. at p. 627.) This countervailing policy is often expressed as a duty to read a contract before signing. Generally, " ' "one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he [or she] has not read it. If he [or she] cannot read, he [or she] should have it read or explained to him [or her]." ' " (*Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 686 (*Ramos*).)

---

7     The California Supreme Court sounded a similar theme when it stated in picturesque (if somewhat dated) language, " 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " (*Seeger v. Odell* (1941) 18 Cal.2d 409, 415.)

In balancing these competing interests, courts have required the plaintiff to have acted in an objectively reasonable manner in failing to become acquainted with the contents of the written agreement. (*Rosenthal, supra*, 14 Cal.4th at p. 423; *Ramos*, supra, 242 Cal.App.4th at p. 688.) The plaintiff must not only have been ignorant of the surreptitiously inserted terms, but must also have had no reasonable opportunity to learn that the document contains them.

In short, the standard is one of excusable ignorance. In making that determination in the context of fraud in the execution of a negotiable instrument, the Uniform Commercial Code explains the relevant factors include: (1) the party's intelligence, education, business experience, and ability to read or understand English; (2) the nature of the representations that were made; (3) whether the party reasonably relied on the representations or justifiably had confidence in the person making them; (4) the presence or absence of any third person who might read or explain the instrument to the signer; (5) any other possibility of obtaining independent information about the document's terms; and (6) the apparent necessity, or lack of it, for acting quickly. (See Cal. U. Com. Code, § 3305, subd. (a)(1)(C) & com. 1, ¶ 5.) We see no reason why these same factors would not also be relevant in determining whether a complaint adequately alleges excusable ignorance here.

*Rosenthal* is a good illustration of how courts apply these principles. There, plaintiffs brought fraud claims in connection with investments they made, and the defendants sought to compel arbitration based on client agreements containing an arbitration clause. (*Rosenthal, supra*, 14 Cal.4th at pp. 402–403.) The Supreme Court found the arbitration agreement unenforceable as to two of the plaintiffs, Giovanna Greco, an 81-year-old

Italian immigrant who spoke only " 'a few words of English' and 'cannot read English at all,' " and her daughter Rosalba Kasbarian, a 45-year-old Italian immigrant who was "able 'to speak and understand simple English,' but 'cannot read English very well at all,' and ha[d] difficulty reading 'complicated words or legal terms.' " (*Id.* at p. 427.) The court held these plaintiffs reasonably failed to read the agreement because they had a previous relationship with the defendant; they had a limited ability to understand English; Greco explained she could not understand what the representative was saying; the representative told them he would read the documents to them while Kasbarian translated for Greco; and when the representative read the documents, he did not mention the contract included an arbitration agreement or that the plaintiffs were giving up their legal rights. (*Id.* at pp. 427–428.)

In contrast, another plaintiff, Raul Pupo had no prior relationship with the defendant or its representative, and the representative did not purport to read the contract to him or orally explain its contents. (*Rosenthal, supra*, 14 Cal.4th at p. 431.) The court concluded, "Under these circumstances, Pupo['s] . . . failure to take measures to learn the contents of the document they signed is attributable to [his] own negligence, rather than to fraud on the part of [defendant] or its representatives." (*Ibid*.)

Appreciating that a demurrer accepts all alleged facts and construes them in the light most favorable to the plaintiff (see, e.g., *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1557), here we conclude the Complaint adequately pleads fraud in the execution of the lease. The seventh cause of action begins by incorporating the previous 184 paragraphs. This encompasses paragraphs 88 and 14, which expressly allege "fraud in the execution" and describe the substitution of lease agreements:

13

"88. Shivam fraudulently and deceitfully changed the agreed July 13 Lease such that it was no longer the same agreement and intentionally deceived Plaintiffs into executing the document *thereby committing fraud in the execution . . . .*" (Italics added.) [¶] . . . [¶]

"14. The parties had negotiated a leaseback in which the defendant sellers were responsible for all renovation costs and operations expenses for the Hotel, but, Defendants SHIVAM and RAJESH switched those terms out, and . . . through trickery and substitution of an altered version of the lease ('the September 13 Lease') after the close of escrow . . . Plaintiffs mistakenly signed a lease that allegedly made *Plaintiffs* responsible for the renovation costs and operating expenses . . . ."

It also incorporates several vicarious liability allegations, including:

"19. The concealed changes in the lease caused the LOAN to be in instant default and subject to acceleration—a fact concealed by the father and son team of RAJESH and SHIVAM . . . . *There was no distinction between defendants PL, and INN [Lending] and the father and son team of . . . Shivam Patel, and [d]efendant Rajesh Patel*, who used and controlled PL and INN [Lending] as an extension of themselves . . . ." (Italics added.) [¶] . . . [¶]

"41. "[T]here was . . . a unity of interest and control by and between SHIVAM, RAJESH, PL, and INN [Lending], that INN [Lending] . . . SHIVAM, [and] RAJESH . . . should be held individually liable for the acts and conduct of . . . INN [Lending] . . . ." [¶] . . . [¶]

"123. [Selling Defendants'] [8] fraudulent intent and their conspiracy is also shown by their failure to sign the agreed lease and their failure to insist that Plaintiffs sign as well. Since they were selling the [property, Selling Defendants'] right to remain in the [property] depended on the execution of the lease. This failure is also evidence of the conspiracy between the [Selling Defendants] and the complicity of

---

8    The Complaint defines "Selling Defendants" as Shivam, Rajesh, PL, and Inn Lending.

14

RAJESH and INN [Lending] since the security of the loan and the value of the property depended on a signed 'absolute NNN lease' as well. RAJESH and INN were clearly aware of the fraud and . . . participat[ed] in the conspiracy."

In addition to alleging fraud in the execution of the September 13 lease, the Complaint also sufficiently alleges Munoz's excusable ignorance of its terms. These allegations include:

1. Munoz is more than 80 years old, Spanish is his primary language, and he is "not proficient in reading English . . . ."[9]

2. Although he has purchased real property before this transaction, none involved a hotel or a leaseback.

3. The "Selling Defendants" drafted and circulated the July 17 lease, "which was confirmed as the final lease at least four times," with the last confirmation "just days before the close of escrow."

4. Because the July 17 lease was the only one ever circulated, Munoz "reasonably believed" the lease transmitted on September 13 was the same and the changes, although material, "were not so numerous to be obvious."

5. The e-mail from Davis to Cassidy on July 17, which transmitted the July 17 lease, only reserved the defendants' right to make changes "in case there was an error or oversight," and prior to close of escrow, defendants did not make any corrections, nor did they ever contend there was an "error or oversight" needing correction. To the contrary, the July 17 lease was "circulated multiple times" without change. It was the only lease agreement circulated before the close of escrow and was approved by Munoz.

6. "Shivam made it appear that he was signing the July 17 lease and did not attempt to identify any difference" between the two leases.

---

[9] The court denied Inn Lending's and Rajesh's request to take judicial notice of a "Language Capacity Declaration," purportedly signed by Munoz that states, "I speak the English language fluently and read with full understanding. I do not require a translator to understand these loan documents." In any event, to the extent this declaration may conflict with the Complaint, that is an issue for trial, not demurrer.

15

In seeking to uphold the trial court's ruling, Rajesh and Inn Lending contend neither of them were involved in the lease transaction. But the Complaint's allegations, deemed true on demurrer, state otherwise. Indeed, the *first* paragraph of the Complaint refutes their argument:

> "1. This Complaint deals with a complex plan perpetrated by a father and son team, Shivam . . . and Rajesh T. Patel . . . through their alter-ego corporate entities, to induce Plaintiffs to enter into a real estate sale/leaseback, loan and guarantee transaction . . . ."

The Complaint further alleges that the "Selling Parties" drafted the July 17 lease and conspired to switch out its terms with the September 13 lease.[10] Summarizing, paragraph 187 alleges the "Selling Defendants always intended to surreptitiously alter the lease . . . ."

Rajesh and Inn Lending also maintain the trial court properly sustained their demurrer because fraud must be alleged with "specificity." Because Inn Lending is a business entity, they contend the Complaint is fatally defective because it does not allege the names of persons who made representations, their authority to speak for the entity, to whom they spoke, and what was said.

This argument fails because the purpose of the rule requiring fraud to be alleged with specificity is " 'to "furnish the defendant with certain definite charges which can be intelligently met." ' " (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356,

---

[10] Rajesh and Inn Lending cite certain exhibits attached to the Complaint to support their assertion, such as the letter of intent, the purchase agreement and its first addendum, and the September 13 version of the lease. But none of these documents contradict the allegations of fraud in the execution. Respondents' argument overlooks the fact that Munoz alleges the fraud arose regardless of what the later documents say. In fact, the September 13 lease is the claimed proof of the fraud.

1384.) Less specificity is required where the nature of the allegations are such that the defendant must necessarily possess full information. (*Ibid.*) Here, Munoz alleges that Rajesh planned to "surreptitiously switch the lease" and "through trickery" substituted an altered version of the lease. Given the nature of the fraud and the alleged alter ego relationship between the Patels and Inn Lending, defendants would already know the extent of their involvement, if any. No additional specificity was required.

A general demurrer cannot be directed against anything other than an entire complaint or count; "it will not lie to part of a cause of action or count." (5 Witkin, Cal. Proc. (6th ed. 2021) Pleading, § 956, p. 355.) Therefore, it is unnecessary to consider, and we express no opinion on whether the complaint *also* adequately alleges promissory fraud. The Complaint properly alleges fraud in the execution. Therefore, the trial court should have overruled the demurrer to the seventh cause of action. Any contentions that Rajesh and/or Inn Lending committed other alleged fraud can be fleshed out in discovery.[11]

B. *The Court Erroneously Sustained The Demurrer to the Contract Causes of Action.*

The parties entered into a purchase agreement as part of the transaction. Among other terms, it obligates the seller to provide the buyer with "[a] fully executed lease, that should include an annual rent payment of $230,000 NNN paid monthly . . . ." In subpart "A" of the first cause of action

---

[11] In addition to alleging fraud in the execution, the Complaint also pleads fraud in the inducement. For example, Munoz alleges the defendants intentionally misrepresented they would sign a triple net lease, and that he relied on that representation. Relatedly, the Complaint claims that the defendants' "bait and switch" on the lease "confirm[s] that they never intended to perform . . . ." As a separate act of fraud, Munoz alleges that Davis sent materially false profit and loss statements for the Hotel, which he relied upon in entering into the transactions. There may be others; this list is not intended to be exhaustive.

17

for breach of contract, the Complaint alleges the "Selling Parties" breached the purchase agreement "by not executing the July 17 Lease agreement and inducing Plaintiffs to execute the September 13 Lease after the escrow closed." In subpart "B" of the same cause of action, Munoz alleges that Inn Lending *also* breached the August 6 letter of intent by providing loan documents that "differed materially from" agreed upon terms.

Sustaining the demurrer to the breach of contract (first cause of action) and breach of implied covenant (eighth) cause of action, the court explained:

> "Plaintiffs allege that Inn Lending 'breached the [letter of intent] when it provided documents that differed materially . . . .' However, the [letter of intent] stated that it would 'not serve as a binding agreement on the part of the lender or applicant.' . . . *Thus, plaintiffs have failed to plead a binding contract between themselves and Inn Lending.*" And implied covenant claims do not exist without the existence of a binding contract. (Italics added.)

This too was erroneous, not because of what the court considered (the letter of intent), but what it overlooked—the purchase agreement.

The ruling was correct about the letter of intent. " 'Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." ' " (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1389.) Here, on its face the letter of intent for financing states it is not a binding agreement. But as noted, the breach of contract cause of action *also* alleges breach of the purchase agreement. And unlike the expressly nonbinding letter of intent, the purchase agreement states: "THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. IT IS

18

INTENDED TO BE A LEGALLY BINDING AGREEMENT.  READ IT
CAREFULLY."

We previously explained that a demurrer cannot be directed to only part of a cause of action.  (*Ante*, p. 17.)  Therefore, the court was required to overrule the demurrer to the first cause of action (and also the eighth to the extent it is based on the purchase agreement) because it adequately alleges breach of the purchase agreement.[12]

C. *The Court Erroneously Sustained the Demurrer to the Elder Abuse Cause of Action*

Under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code,[13] § 15600 et seq.), an elder is "any person residing in this state, 65 years or older." (§ 15610.27.)  Munoz, who alleges he is 80 years old, asserted an elder abuse cause of action under sections 15610.30 and 15657.6.

Section 15610.30, subdivision (a)(1) broadly defines financial abuse of an elder as occurring when a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder" for "a wrongful use or with intent to defraud, or both."  Section 15657.6 defines a separate species of elder abuse—financial abuse of an elder who is of "unsound mind, but not

---

[12]  In conjunction with its demurrer, Inn Lending and Rajesh also filed a motion to strike portions of the Complaint.  The trial court denied that motion as moot in light of its ruling on the demurrer.  Nothing in this opinion would preclude Inn Lending and/or Rajesh from resurrecting or refiling a motion to strike on remand, so long as that motion is consistent with the law-of-the-case effect of this decision.  (See generally, *Aghaian v. Minassian* (2021) 64 Cal.App.5th 603, 612 [law of the case may apply on appeal from a judgment on a demurrer]; *Bourdieu v. Seaboard Oil Corp.* (1944) 63 Cal.App.2d 201, 203.)

[13]  Undesignated statutory references are to the Welfare and Institutions Code.

entirely without understanding" or "lacks capacity." (§ 15657.6.) It provides that the person who took the property from such an elder must return it upon demand. Unlike section 15610.30, a claim under section 15657.6 does not require any showing of "wrongful use," fraud, or undue influence. Rather, it "subjects the person who took the property to the remedies for financial abuse merely on a showing that the defendant failed to comply with the demand to return the property or restore the property interest to the victim." (Balisok, Cal. Practice Guide: Elder Abuse Litigation (The Rutter Group 2021) ¶ 8.8, p. 8-7.)

Here, the court sustained the demurrer to the elder abuse cause of action on the grounds that Munoz "has not alleged that he 'lacks capacity' or is of an 'unsound mind' pursuant to section 15657.6." It is true the Complaint lacks these allegations, and therefore fails to state a cause of action under that statute. But that does not resolve the elder abuse cause of action because it also purports to state a claim for relief under section 15610.30, which does not require lack of mental capacity.

Addressing section 15610.30, the court also determined the Complaint failed to sufficiently allege the essential element of "wrongful use." But under subdivision (a) of this statute, an actionable taking is one involving *either* a "wrongful use" *or* done "with the intent to defraud, or both." (§ 15610.30, subd. (a).) Here, the elder abuse cause of action incorporates by reference all previous allegations. This includes allegations that Rajesh and Inn Lending committed fraud in the execution. Moreover, paragraph 160 alleges the defendants' scheme to "swap[ ] the lease agreement" and thereby trigger an "immediate default placing [Munoz's] personal assets at risk . . . ." To state a cause of action under section 15610.30 based on an "intent to defraud," no more was necessary.

20

## DISPOSITION

The judgment is reversed.  Appellants shall recover costs on appeal, jointly and severally against Rajesh Patel and Inn Lending, LLC.


DATO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.