Filed 9/26/24  Perez v. R.M.T. Contracting CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANGEL PEREZ et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>R.M.T. CONTRACTING, INC.,<br><br>Defendant and Appellant. | F086606<br><br>(Super. Ct. No. BCV-22-101657)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Bernard C. Barmann, Jr., Judge.

Belden Blaine Raytis, T. Scott Belden, Kaleb L. Judy, and Tyler D. Anthony for Defendant and Appellant.

Lavi & Ebrahimian, Joseph Lavi, Jordan D. Bello, Vincent Granberry, and Will Tran for Plaintiffs and Respondents.

-ooOoo-

Defendant R.M.T. Contracting, Inc. (R.M.T.), a labor contractor, appeals from an order of the Kern County Superior Court denying its motion to compel arbitration. R.M.T. contends the superior court "misapplied the applicable burdens of proof" (capitalization omitted) by shifting the burden of proving a defense to the enforcement of a purported arbitration agreement from plaintiff Angel Perez (who raised the defense) to R.M.T.

We find the superior court misallocated the burden of proof, and the error was prejudicial. We reverse the court's order and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

Perez was formerly employed by R.M.T. as a forklift operator assigned to packinghouses operated by R.M.T.'s client Sun Pacific Shippers, L.P. (Sun Pacific Shippers). On July 6, 2022, Perez filed a class action complaint against R.M.T. and Sun Pacific Shippers alleging various Labor Code violations.

On January 27, 2023, R.M.T. concurrently filed a motion to compel arbitration and a declaration of R.M.T.'s president Rocio Tinajero in support thereof. Tinajero averred in part:

> "6.     On February 1, 2020, [Perez] was presented with an agreement to arbitrate (the 'Arbitration Agreement'). [Perez] executed the Arbitration Agreement on February 1, 2020 under the name 'Angelo Ramirez.' . . .  The Agreement was presented to [Perez] in both English and Spanish.

> "7.     The Arbitration Agreement expressly provides that an employee may opt-out of the agreement and that '[a]n Employee that opts out . . . will not be subject to any adverse employment action because of that decision . . . .'  Since the execution of the Agreement on February 1, 2020, [Perez] never submitted written notice revoking this Agreement or otherwise opting out of the Agreement."

Attached to Tinajero's declaration was a document in English titled "Arbitration Agreement" and signed by "Angelo Ramirez" and Tinajero on February 1, 2020.

2.

On February 14, 2023, Perez filed his opposition to R.M.T.'s motion. Among other things, he argued the motion must be denied on the basis of fraud in the execution. Perez specified, "he could not read the English-only arbitration agreement" and "Sun Pacific[ Shipper]'s agent obtained [his] signature by misrepresenting the nature of the document he signed." In an accompanying declaration,[1] he averred in part:

> "2.     I am a Hispanic male, born in Quito, Ecuador on August 9, 1982, and learned Spanish as my first language. I went to school in Ecuador through the eleventh grade and my schooling was only in Spanish. I am only able to speak and read Spanish. I ask that people communicate with me in Spanish because I do not understand English.

> "3.     . . . I understand that Defendants say I signed the [arbitration agreement] during my employment with Defendants. I cannot read this paper because it is in English. I believe this paper was in a stack of papers that my former supervisor, Hilda Beltran of Sun [Pacific] Shippers, had me sign on February 1, 2020 during my employment. Hilda Beltran never told me that the paper I was signing would give up my right to file a lawsuit nor did she use the word 'arbitration.' She only told me that the paper was 'just policies from the company' and that I needed to sign it to continue working for Defendants. [¶] . . . [¶]

> "5.     On February 1, 2020, Hilda Beltran called me into her office during my shift. Rocio Tinajero was not present during this time. Hilda Beltran presented me with documents from R.M.T. and instructed me to fill them out. The documents she asked me to fill out were almost all in Spanish because Hilda Beltran and Defendants knew I could only communicate in Spanish. The documents she asked me to fill out are the documents attached as Exhibit 2 to my declaration.[2] Along with those documents was the English-only arbitration agreement.

_____

**1** The record contains Perez's original declaration in Spanish as well as a certified English translation thereof. In this opinion, we rely on the latter.

**2** The attached documents included (1) a job questionnaire/agreement (in English and Spanish); (2) a Form W-4 (in English); (3) a form acknowledging receipt of information regarding the medical provider network program (in English and Spanish); (4) a form declining employer health plan coverage (in Spanish); (5) a form acknowledging receipt of R.M.T.'s rules and policies (in Spanish); (6) a Form I-9 (in English); (7) a Labor Code section 2810.5 notice (in English); and (8) a form acknowledging receipt of training in the identification, prevention, and reporting of

"6.    A majority of the documents were in Spanish and/or included a Spanish translation. I told Hilda Beltran I could not read English and could only read Spanish and asked her to translate the English-only documents to Spanish so I could understand what Information to put in and what I was signing.

"7.    However, when I asked Hilda Beltran to translate the document, which I now understand as the arbitration agreement, she stated that it was 'just policies from the company' and that I needed to sign it to continue working for Defendants. I then requested for a Spanish-version, but she assured me that it was 'just policies from the company.' Hilda Beltran never provided me with a Spanish-version of the document. Although I never received a Spanish version of the arbitration agreement, I quickly signed the documents, including the English-only arbitration agreement because I was still clocked-in for my shift at Sun [Pacific] Shippers and had to return to my station as soon as possible and Hilda Beltran told me that I needed to sign it to continue working for Defendants. I understand that Defendants contend that I received a Spanish version of the arbitration agreement, but neither Hilda Beltran nor anyone else ever gave me a Spanish version of the arbitration agreement. I never received, reviewed or signed a Spanish version of the arbitration agreement. I only received the English document, which Hilda Beltran told me was 'just policies from the company.'

"8.    Hilda Beltran never told me that the document was actually an arbitration agreement. She never even said the word 'arbitration' or that I was signing an agreement or contract giving up my right to file a lawsuit. She never told me that by working for Defendants I would be required to give up my right to file a lawsuit against them for any disputes we had against each other. Because she was my supervisor and she knew I could not read English, I believed Hilda Beltran when she told me the document was 'just policies from the company' and I had to sign it in order to continue working for Defendants.

"9.    If I had known that by signing the agreement, I would be giving up my right to file a lawsuit against Defendants and I was given the option to not sign an agreement, I would not have signed the agreement."

---

sexual harassment in the workplace (in Spanish). All were signed by "Angelo Ramirez" and all except the sexual harassment training acknowledgment form were dated February 1, 2020.

4.

On February 21, 2023, R.M.T. filed its reply.  Among other things, the company insisted Perez "can understand English" and "was provided with a Spanish version of the Arbitration Agreement."  (Boldface omitted.)  Accompanying the reply were declarations of Tinajero, Beltran, and Jenny Velardi in support of the motion to compel arbitration.  Tinajero averred in part:

> "2.      . . . I personally interacted with Plaintiff . . . at various times.  My understanding from those interactions is that his first language is Spanish.
>
> "3.      However, I have also seen and heard him speaking in English.  For example, I was present with Plaintiff at the hospital after Plaintiff's girlfriend was injured.  I saw and heard Plaintiff speaking with the doctor in English.
>
> "4.      When he worked for RMT, Plaintiff did not have a reputation as someone who could not understand English.  Other employees saw and heard him speaking in English, and observed him translating English documents into Spanish for coworkers.
>
> "5.      I looked over the paperwork Plaintiff attached as Exhibit '2' to his Declaration, which he filled out on February 1, 2020.  Plaintiff understood English enough to correctly fill out the form 'W-4', including noting that he wanted tax withholding to be made at the higher 'Single' rate although he was married.  The W-4 form was in English only.
>
> "6.      He also filled out the 'I-9' form, which again is in English only.  The I-9 form includes a place for preparer or translator information if the individual needed one to complete the form.  Plaintiff did not need a preparer or translator to complete the form.
>
> "7.      . . . I **know** Plaintiff was presented with a Spanish version of the Arbitration Agreement at issue here.  Although I was not present when Plaintiff signed the Agreement, I later signed that document on behalf of RMT.  The English version, which Plaintiff signed, was on one side of a piece of paper, and the Spanish version was on the other side.
>
> "8.      At that time, all of RMT's arbitration agreements were presented to employees in this double-sided format.

"9.     However, when the signed agreements were scanned for saving, usually only the side that was signed is scanned.  The two-sided physical original is placed into storage.

"10.     RMT has since moved to a two-column format for arbitration agreements, with the English and Spanish text side-by-side."

Next, Beltran averred in part:

"2.     I do not specifically remember meeting with Plaintiff . . . on February 1, 2020, when he filled out various forms required by RMT.

"3.     However, before that date I had heard Plaintiff speaking English multiple times, and my understanding from talking with Plaintiff was that he had previously worked in jobs that required some level of understanding and reading English.  So, I do not believe that he asked me to translate any documents for him on that occasion or told me he did not understand English.

"4.     All the arbitration agreements RMT used at that time were double-sided, with Spanish on one side and English on the other side.  If Plaintiff had asked me to translate the arbitration agreement from Spanish to English for him I would have told him to just turn the paper over."

Finally, Velardi averred in part:

"2.     During my employment with RMT, I personally interacted with Plaintiff . . . at various times.  My understanding from those interactions is that his first language is Spanish.

"3.     However, I have also seen and heard him speaking with people in English.

"4.     On one occasion, I saw and heard him translating a letter that was in English into Spanish for a coworker."

At a February 28, 2023 hearing, the superior court granted Perez leave to respond to R.M.T.'s new evidence.  On March 14, 2023, Perez concurrently filed a supplemental opposition to R.M.T.'s motion and another declaration.[3]  In that declaration, Perez averred in part:

---

[3] The record contains Perez's original declaration in Spanish as well as a certified English translation thereof.  In this opinion, we rely on the latter.

"2.     I understand that there are employees from R.M.T., including someone named Jenny Velardi, Hilda Beltran, and Rocio Tinajero, alleging that I could speak and read English.  As I stated in my prior declaration, I consider myself only able to speak and read Spanish.  I can speak and understand very basic English, like 'how are you' or responding 'I am doing good' or other similar basic English.  But I do not believe that this means I can speak English.  I cannot have conversations in English with people other than basic English.  That is why I ask that people communicate with me in Spanish and say that I do not understand English.

"3.     I understand that Rocio Tinajero claims that she heard me speaking in English with a doctor at a hospital after my girlfriend had her leg run over by a forklift while she was working at Sun Pacific Shippers. . . .  I refer to my girlfriend as my wife even though we are not formally married.  Ms. Tinajero was present at the hospital when my wife was injured because I believe she had the company paperwork so that my wife could get medical assistance.  I was only with the doctor and my wife for approximately five minutes before he left and I had very limited communication with the doctor.  When I was allowed to go back to see my wife, I approached where she was on a bed and there was a Caucasian doctor treating my wife.  He did not speak Spanish.  I had asked him if he spoke Spanish and he said 'no.'  I only asked him in English 'is she okay' and he said 'yeah, she is fine.'  I asked my girlfriend in Spanish how to ask the doctor about how the baby was and she told me, so I asked him in English 'how is the baby going' and he said they needed to do an ultrasound.  But that was the only English I spoke to him because I could not speak any more English than basic English.  My wife can speak English so she was the one primarily communicating with the doctor.

"4.     I understand that Rocio Tinajero also claims that I can read English because I completed English 'W-4' and 'I-9' forms.  I understood on the 'W-4' and 'I-9' forms where to put my personal information like name and address and telephone information even though it was in English.  But I believe that is basic English that I learned how to fill out that information from experience filling out applications with assistance from others in this country and it does not mean I can read English.  For the information other than my name and contact information which I had to fill in the 'W-4' form, Hilda Beltran assisted me to fill out the form.

"5.     I also understand that Rocio Tinajero and Hilda Beltran claim that the arbitration agreement that I signed had a Spanish translation on the back of the paper.  But there was no Spanish translation on the back of the paper I signed.  That is why I asked Hilda Beltran to tell me what the

7.

document was because I could not read it in English and Hilda Beltran told me that it was 'just policies from the company' and that I needed to sign it to continue working for the company.

"6.     I also understand that Hilda Beltran says she heard me speaking English at work. I was not generally around Hilda Beltran so I do not know when she would have heard me speaking English. But if she ever did hear me speaking English, she is likely referring to only the basic English which I had used like responding to 'how are you' or asking someone 'how are you' or other basic English. But she would not have heard me having more complex conversations with coworkers in English because I cannot understand more than basic English.

"7.     I also understand that Hilda Beltran says that I had told her that I previously worked in jobs which required understanding and reading English. I have never told Hilda Beltran that I had a job that required that I understand or read English. I did work for a company working with garlic where I had a supervisor who could not speak Spanish and only spoke English. R.M.T. would at times provide employees to the garlic company, so I think this might be what Hilda Beltran might be talking about. But there was not a requirement that I speak or read English to work for the garlic company. Most of the time, my supervisor who could not speak Spanish would be asking for basic tasks that I would already have to perform everyday and I learned and then understood what the basic requests meant in English. He would also have some basic phrases in Spanish so that he was able to communicate with me of what tasks he needed completed. There were also other employees who worked with us who spoke English and Spanish so if there was a time where I was not understanding what he was asking for, a coworker would help explain in Spanish what he wanted me to do.

"8.     I understand that an employee named Jenny Velardi claims that she worked with me and saw and heard me speaking with coworkers in English. I worked with a Filipino woman named Jenny but I do not remember her last name so I am not sure if that is Jenny Velardi. If Ms. Velardi says she had seen me or heard me speaking with coworkers in English, she would likely be referring to only the basic English which I had used like responding to 'how are you' or asking someone 'how are you' or other basic English. But she would not have heard me having more complex conversations with coworkers in English because I cannot understand more than basic English.

"9.     I also understand that Jenny Velardi claims that on one occasion she saw and heard me translating a letter that was in English into

Spanish for a coworker. I do not know what occasion Ms. Velardi is referring to or who she claims I was translating an English letter for, but I would not have been able to translate an English letter to Spanish for a coworker. I can pick out a few basic words in English that I understand, but I could not translate a document from English to Spanish or read anything more tha[n] basic English. I do not recall or believe that I ever assisted an employee to translate an English document."

A motion hearing was conducted on March 21, 2023. At the outset, the court stated and explained its tentative opinion. It opined that: (1) R.M.T. met its initial burden to show there was an arbitration agreement by attaching a copy of the signed English language version of an arbitration agreement; (2) Perez's declaration "create[d] a factual dispute whether there was mutual assent to enter into an arbitration agreement"; and (3) R.M.T. then failed to prove by a preponderance of the evidence that there was mutual assent when Perez signed the English version of the agreement.

Following additional arguments by the parties, the court pronounced:

"All right. The Court is satisfied that its tentative should be the ruling of the Court. [¶] I will deny the motion. . . ."

Thereafter, R.M.T.'s counsel requested a statement of decision.

A proposed statement of decision was mailed to the parties on April 10, 2023. It read in part:

"Per *Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 754 (*Iyere*):

" 'If a party to a civil action asks the court to compel arbitration of the pending claim, the court must determine in a summary proceeding whether an "agreement to arbitrate the controversy exists." (See Code Civ. Proc., §§ 1281.2, 1290.2; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 412–413 (*Rosenthal*).) "Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises a defense to enforcement . . . that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense." (*Rosenthal*, *supra*, at p. 413.)

9.

"*Iyere*, *supra*, at p. 755:

"The arbitration proponent must first recite verbatim, or provide a copy of, the alleged agreement. [Citations.] A movant can bear this initial burden 'by attaching a copy of the arbitration agreement purportedly bearing the opposing party's signature.' [Citation.] At this step, a movant need not 'follow the normal procedures of document authentication' and need only 'allege the existence of an agreement and support the allegation as provided in [California Rules of Court,] rule [3.1330].' [Citation.]

"If the movant bears its initial burden, the burden shifts to the party opposing arbitration to identify a factual dispute as to the agreement's existence—in this instance, by disputing the authenticity of their signatures. To bear this burden, the arbitration opponent must offer admissible evidence creating a factual dispute as to the authenticity of their signatures. The opponent need not prove that his or her purported signature is not authentic, but must submit sufficient evidence to create a factual dispute and shift the burden back to the arbitration proponent, who retains the ultimate burden of proving, by a preponderance of the evidence, the authenticity of the signature. [Citation.]

"[R.M.T.] meets [its] initial burden of proof by attaching a copy of the signed [English] arbitration agreement.

"The burden passes to [Perez] to produce admissible evidence creating a factual dispute as to the existence of the agreement – here it would be the issue of mutual assent. [Perez]'s declaration does not deny signing the [English] agreement, but asserts that Beltran (who claims she does not recall the incident, so does not deny it) told him to sign it when he asked her to translate it, but Beltran only said it was [R.M.T.]'s 'policy' that he needed to sign to stay employed and did not say it was an arbitration agreement. [Perez] states he only reads/understands Spanish. [Perez] states he was not provided with a copy of the Spanish version of the agreement.

"[Perez]'s declaration creates a factual dispute whether there was mutual assent to enter into an arbitration agreement. Therefore, the burden passed back to [R.M.T.] to prove by a preponderance of the evidence that there was mutual assent when [Perez] signed the [English] version. [R.M.T.] fails to meet its burden.

"Defendant offers a supplemental declaration by T[ina]jero and Beltran and a new declaration by Jenny Velardi[] in an attempt to show that [Perez] knew, read, and understood English. These declarations fail to meet [R.M.T.]'s burden. T[ina]jero asserts the Spanish version of the agreement

10.

was on the back of the English version, but fails to state that anyone pointed that out to [Perez].  Additionally, she has a copy of the English version, which she and [Perez] signed, but fails to state whether they signed them at the same time and what the circumstances of signing were.  Additionally she provides a copy of the Spanish version, but without [Perez]'s signature.  This fails to prove anything – she does not say that this is the back of [Perez]'s signed English [v]ersion and without [Perez]'s signature, she fails to prove that [Perez] read it or was provided with a copy of it.

"Beltran's supplemental declaration essentially states she does not remember the circumstances of the signing.  So any purported facts regarding the signing of the agreement are without foundation.

"Velardi[]'s declaration also fails to provide any admissible evidence regarding [Perez]'s English proficiency, as she states one purported occasion and an unspecified location, date and time that she 'overheard' [Perez] translating an English [l]etter into Spanish for an unspecified co-worker.  She fails to provide any specific information – what was [Perez] saying, how does she know he was 'translating' English into Spanish, how does she know it was a letter and who was the co-worker (who may have been the best person to provide a declaration as to this incident).

> " [']A contract is void for fraud in the execution if the promisor was deceived as to the nature of his or her act and did not know what he or she was signing or never intended to enter into a contract.  [Citation.]  For example, a misrepresentation as to the character or essential terms of a proposed contract can render the promisor's assent ineffective.  [Citation.][']  [¶]  (*Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1308.)

"As [R.M.T.] failed to meet[] its burden of proving by a preponderance of the evidence that there was mutual assent when [Perez] signed the [English] version of the agreement, the Agreement is void.[4, 5]"

---

[4] Any case citation in the quoted text was reformatted to conform to the general rules of citation outlined by the California Style Manual.  (See generally Cal. Style Manual (4th ed. 2000).)

[5] The statement of decision also contains a finding that the arbitration agreement was procedurally unconscionable.  However, at the March 21, 2023 motion hearing, the court expressed it was "not making any findings" regarding procedural unconscionability

On May 1, 2023, R.M.T. filed its objections to the proposed statement of decision. Among other things, the company argued the court misallocated the burden of proving fraud in the execution. In a minute order dated July 6, 2023, the court overruled the objections and adopted the proposed statement of decision as the final statement of decision.

On July 25, 2023, R.M.T. filed its notice of appeal.[6]

---

and stressed its "basis for denying the motion is with respect to lack of mutual assent." Moreover, in the respondent's brief, Perez does not contend the agreement was unconscionable.

[6] On August 9, 2023, counsel for R.M.T. filed a mandatory Judicial Council form APP-004. (See Cal. Rules of Court, rule 8.100(g) [appellant "must serve and file in the reviewing court a completed *Civil Case Information Statement* (form APP-004)"].) In said form, under "**PART II – NATURE OF ACTION**," the second item presented a checkbox preceding the following line: "This appeal is entitled to calendar preference/priority on appeal *(cite authority)* . . . ." Counsel left this checkbox blank. "In a properly completed form [APP-004], the box would have been marked and Code of Civil Procedure section 1291.2 would have been cited. That section provides that hearings in all proceedings brought under the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) shall have preference over all other civil proceedings so that the arbitration 'proceedings shall be quickly heard and determined.' [Citations.]" (*Ramirez v. Golden Queen Mining Co., LLC* (2024) 102 Cal.App.5th 821, 829 (*Ramirez*).) Counsel's misstatement of law was repeated in November 2023 and January 2024 when he filed applications for an extension of time to file the opening brief that indicated "[t]his case is not entitled to priority." (See Cal. Rules of Court, rules 8.60(c)(2)(D) [applications for extension of time must state good cause for granting said extension "consistent with the factors in rule 8.63 (b)"], 8.63(b)(6) ["[w]hether [a] case is entitled to priority" among enumerated factors to be considered by a court in determining good cause]; Bus. & Prof. Code, § 6068, subd. (d) [prohibiting attorneys from misleading "the judge or any judicial officer by an artifice or false statement of fact or law"]; Rules Prof. Conduct, rule 3.3(a)(1) [lawyer shall not "knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer"].)

12.

# DISCUSSION

## I.      Motion to compel arbitration.

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that:  [¶]  (a) The right to compel arbitration has been waived by the petitioner; or  [¶]  (b) Grounds exist for rescission of the agreement."  (Code Civ. Proc., § 1281.2.)  "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable."  (*Rosenthal*, *supra*, 14 Cal.4th at p. 413.)  In a summary proceeding (Code Civ. Proc., § 1290.2), "the trial court sits as a trier of fact, weighing all affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972).

### a.  *Existence of an arbitration agreement.*

"Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence."  (*Rosenthal*, *supra*, 14 Cal.4th at p. 413.)  Although "[t]he burden of persuasion[7] is always on the moving party to prove the existence of an arbitration agreement with the opposing party by a preponderance of the evidence" (*Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 164 (*Gamboa*), criticized on

---

**7** "The terms burden of proof and burden of persuasion are synonymous." (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1667 (*Sargent*).)  In this opinion, we use these terms interchangeably.

another ground by *Ramirez*, *supra*, 102 Cal.App.5th at pp. 825, 835), "the burden of production may shift in a three-step process" (*Gamboa*, *supra*, at p. 165).

"First, the moving party bears the burden of producing 'prima facie evidence of a written agreement to arbitrate the controversy.' " (*Gamboa*, *supra*, 72 Cal.App.5th at p. 165, quoting *Rosenthal*, *supra*, 14 Cal.4th at p. 413.) "The party seeking arbitration can meet its initial burden by attaching to the petition a copy of the arbitration agreement purporting to bear the respondent's signature." (*Bannister v. Marinidence Opco, LLC* (2021) 64 Cal.App.5th 541, 543–544; accord, *Iyere*, *supra*, 87 Cal.App.5th at p. 755.)

"If the moving party meets its initial prima facie burden and the opposing party disputes the agreement, then in the second step, the opposing party bears the burden of producing evidence to challenge the authenticity of the agreement." (*Gamboa*, *supra*, 72 Cal.App.5th at p. 165.) The opposing party " 'must offer admissible evidence creating a factual dispute as to the authenticity of the[] signatures. The opponent need not prove that his or her purported signature is not authentic, but must submit sufficient evidence to create a factual dispute and shift the burden back to the arbitration proponent, who retains the ultimate burden of proving, by a preponderance of the evidence, the authenticity of the signature.' " (*Ramirez*, *supra*, 102 Cal.App.5th at pp. 832–833, italics omitted, quoting *Iyere*, *supra*, 87 Cal.App.5th at p. 755.) For example, the opposing party may present "evidence that she never saw the agreement during the onboarding process and did not affix her electronic signature to it" (*Bannister v. Marinidence Opco, LLC*, *supra*, 64 Cal.App.5th at p. 544) or a declaration stating "he did not recall [electronically] signing any arbitration agreement on [a particular date], or at any other time, and if he had been presented with an agreement that limited his ability to sue [the employer] he would not have signed it" (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 840). (Cf. *Iyere*, *supra*, 87 Cal.App.5th at p. 758 ["If a party confronted with his or her handwritten signature on an arbitration agreement is unable to allege that the signature is inauthentic or forged, the fact that that person does not recall signing the

14.

agreement neither creates a factual dispute as to the signature's authenticity nor affords an independent basis to find that a contract was not formed."].)

"If the opposing party meets its burden of producing evidence, then in the third step, the moving party must establish with admissible evidence a valid arbitration agreement between the parties. The burden of proving the agreement by a preponderance of the evidence remains with the moving party." (*Gamboa*, *supra*, 72 Cal.App.5th at pp. 165–166; accord, *Ramirez*, *supra*, 102 Cal.App.5th at p. 830.)

    b.  *Fraud in the execution.*

"A contract is void for fraud in the execution if the promisor was deceived as to the nature of his or her act and did not know what he or she was signing or never intended to enter into a contract. [Citation.] For example, a misrepresentation as to the character or essential terms of a proposed contract can render the promisor's assent ineffective." (*Mt. Holyoke Homes*, *supra*, 219 Cal.App.4th at p. 1308, citing *Rosenthal*, *supra*, 14 Cal.4th at pp. 415, 420; see, e.g., *Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 686–690 (*Ramos*) [Spanish-speaking plaintiff with limited English proficiency signed agreement in English containing arbitration provision after reviewing Spanish translation of agreement that did not contain said provision].) "In a fraud in the execution case, 'California law . . . requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had "reasonable opportunity to know of the character or essential terms of the proposed contract." ' [Citation.] Thus, a 'party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract.' [Citation.]" (*Ramos*, *supra*, at pp. 688–689, fn. omitted.)

15.

"If the party opposing the petition [to compel arbitration] raises a defense to enforcement [such as] fraud in the execution voiding the agreement, . . . that party bears the burden of producing evidence of . . . any fact necessary to the defense. [Citation.]" (*Rosenthal*, *supra*, 14 Cal.4th at p. 413; accord, *Iyere*, *supra*, 87 Cal.App.5th at p. 754.) Once the party opposing the petition "produces evidence sufficient to make its prima facie case, the burden of producing evidence shifts to the other party to refute the prima facie case." (*Sargent*, *supra*, 110 Cal.App.4th at p. 1668, italics omitted; see Evid. Code, § 550; *Asadoorian v. Kludjian* (1930) 210 Cal. 564, 565; *Jackson v. Burke* (1954) 124 Cal.App.2d 519, 526.) Even though the burden of production shifts, the party opposing the petition retains the burden of proving "any fact necessary to the defense" "by a preponderance of the evidence." (*Rosenthal*, *supra*, at p. 413; see *Asadoorian v. Kludjian*, *supra*, 210 Cal. at p. 565; *Jackson v. Burke*, *supra*, 124 Cal.App.2d at p. 526.)

## II.     Standard of review

" ' " ' "There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed. [Citations.]" ' " ' [Citation.]" (*Nieto v. Fresno Beverage Co., Inc.* (2019) 33 Cal.App.5th 274, 279; see *Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 949 ["Allocation of the burden of proof presents a question of law, which we review de novo."].)

## III.    Analysis

### a. *Error.*

On appeal, R.M.T. contends the superior court "incorrectly confused R.M.T.'s burden to prove the existence of an arbitration agreement . . . with [Perez]'s burden to prove his defense of fraud in the execution" (underlining omitted), which "improperly

shifted the burden onto R.M.T. to disprove fraud in order to prevail on its motion." We agree.

As reflected in the transcript of the March 21, 2023 motion hearing and the statement of decision, the court—at the outset—considered the question of whether an arbitration agreement existed and employed the burden-shifting framework set forth in cases such as *Gamboa* and *Iyere*. (See *Ramos*, *supra*, 242 Cal.App.4th at p. 685 ["[W]hen presented with a motion to compel arbitration, the court's first task is to determine whether the parties have entered into an agreement to arbitrate their claims."].) It concluded R.M.T. met its initial burden of production by supplying a copy of the English arbitration agreement signed by "Angelo Ramirez" and Tinajero on February 1, 2020 (see *Bannister v. Marinidence Opco, LLC*, *supra*, 64 Cal.App.5th at pp. 543–544) and recognized the burden shifted to Perez "to produce admissible evidence creating a factual dispute as to the existence of the agreement." Of particular concern to the court was the element of mutual assent. (See *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270 ["An essential element of any contract is the consent of the parties, or mutual assent."]; *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 ["Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."].) The court examined Perez's February 14, 2023 declaration, in which Perez admitted his signature was on the English version of the agreement. (Cf. *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067 [employee declared she did not sign arbitration agreement].) This "demonstrated mutual assent and an intent to enter into the agreement." (*Caballero v. Premier Care Simi Valley LLC* (2021) 69 Cal.App.5th 512, 518 (*Caballero*); see *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 ["A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement."].) Perez averred he is a native Spanish speaker and

could not read the English version of the agreement, but "[his] inability to read English and his limited ability to speak or understand English [alone] do not alter the conclusion that his signature[] . . . on the contract manifested his agreement to its terms." (*Caballero*, *supra*, at p. 518; see *ibid.* ["Generally, a party may not avoid enforcement of an arbitration provision because the party has limited proficiency in the English language."].) Had the declaration been so limited, the analysis under the *Gamboa*/*Iyere* framework would have been truncated, straightforward, and in R.M.T.'s favor. (See *id.* at pp. 518–520.)

Perez, however, specifically invoked the defense of fraud in the execution. (See *Rosenthal*, *supra*, 14 Cal.4th at p. 413; see also *People v. Noble* (2002) 100 Cal.App.4th 184, 189 ["An affirmative defense is one which does not negate an essential element of a cause of action . . . , but instead presents new matter to excuse or justify conduct that would otherwise lead to liability."].) He averred (1) he told Beltran—the supervisor who presented him with the arbitration agreement—he "could not read English"; (2) he asked Beltran to translate the agreement; (3) he alternatively asked for a Spanish version of the agreement; (4) Beltran neither translated the English agreement nor provided a Spanish version, characterized the agreement as " 'just policies from the company,' " and advised he "needed to sign it to continue working for" R.M.T. and Sun Pacific Shippers; and (5) he signed the document because he wanted to keep his job, "was still clocked-in for [his] shift," and "had to return to [his] station as soon as possible." (Cf. *Caballero*, *supra*, 69 Cal.App.5th at p. 519 ["no evidence" the plaintiff asked "for a Spanish version of the agreement or assistance in understanding the English version"].) Based on the statement of decision, which made references to *Rosenthal*, the court was ostensibly aware the burden of proving a defense belonged to Perez. Yet, it remained tethered to the *Iyere*/*Gamboa* framework for determining whether an arbitration agreement existed, concluding Perez's declaration "creates a factual dispute whether there was mutual assent to enter into an arbitration agreement" and "the burden passed back to [R.M.T.] to prove

18.

by a preponderance of the evidence that there was mutual assent when [Perez] signed the [English] version" of the agreement. As a result, the court misallocated the burden of proving fraud in the execution.[8] Under our high court's precedent, it is Perez—not R.M.T.—who "bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense." (*Rosenthal*, *supra*, 14 Cal.4th at p. 413; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California."].)

While erroneous, the superior court's approach is not devoid of reason. "Where there is fraud in the execution, ' " 'mutual assent is lacking, and [the contract] is *void*.' " ' " (*Munoz v. Patel* (2022) 81 Cal.App.5th 761, 775, quoting *Rosenthal*, *supra*, 14 Cal.4th at p. 415; see *Colby v. Title Ins. and Trust Co.* (1911) 160 Cal. 632, 644 [void contract "has no existence whatever"].) Since the party petitioning to compel arbitration bears the burden of proving the existence of a contract, i.e., an arbitration agreement (*Rosenthal*, *supra*, 14 Cal.4th at p. 413), and mutual assent is an essential element of any contract (*Donovan v. RRL Corp.*, *supra*, 26 Cal.4th at p. 270), one could believe that party is obligated to refute claims of fraud negating mutual assent and voiding the agreement. At least one appellate court takes this stance. (See *Ramos*, *supra*, 242 Cal.App.4th at pp. 687–690.) Nevertheless, in view of *Rosenthal*, we must reject any endeavor to impose the burden of proving fraud in the execution voiding an arbitration agreement on the party that seeks arbitration.

b. *Prejudice.*

"Misallocation of the burden of proof in a bench trial is not reversible error per se but must be prejudicial to warrant reversal. [Citation.] Prejudice means ' "a reasonable

---

**8** We reject Perez's assertions any finding of misallocation would be based on "ambiguity in the record."

probability that in the absence of the error, a result more favorable to [the appellant] would have been reached." ' [Citation.] A probability does not mean 'more likely than not' but 'a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287.) Where an affirmative defense is concerned, a misallocation error is harmless if the defense can still be established "under the correct burden of proof and legal principles" and "the facts of the case." (*Nautilus, Inc. v. Yang* (2017) 11 Cal.App.5th 33, 37.)

If the burden of proof were properly allocated in this case, the superior court would have had to resolve the following issues seriatim: (1) whether Perez produced sufficient evidence to make a prima facie case of fraud in the execution; (2) in the event Perez successfully produced that evidence, whether R.M.T. produced any rebuttal evidence; and (3) whether Perez proved the defense by a preponderance of the evidence. (See *ante*, at p. 16.) Regarding the first issue, Perez averred he told Beltran he "could not read English" and asked her to either translate the English agreement or provide a Spanish version thereof. In response, Beltran misrepresented the character of the arbitration agreement as " 'just policies from the company' " and advised Perez to sign the agreement to keep his job. (See *Caballero*, *supra*, 69 Cal.App.5th at p. 519 ["All [plaintiff] had to do was tell [defendant] that he cannot read English and the burden would have shifted to [defendant] to explain the contents of the Arbitration Agreement."].) Because Perez would have met his initial prima facie burden, the burden would have shifted to R.M.T. to produce evidence refuting the prima facie case.

Regarding the second issue, R.M.T. offered the declarations of Tinajero, Beltran, and Velardi. As noted, the court mistakenly scrutinized these declarations under an elevated preponderance-of-the-evidence standard. Even assuming, arguendo, these declarations did not satisfy R.M.T.'s burden of producing rebuttal evidence, such a failure "risks an adverse verdict" (*Sargent*, *supra*, 110 Cal.App.4th at p. 1668) but is not

dispositive. "[R]egardless of whether [R.M.T.] produces any evidence at all, it remains for the fact finder to say whether [Perez] has in fact met [his] burden to the requisite degree of certainty." (*Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 132; see *Sargent*, *supra*, at p. 1668 ["Once a prima facie showing is made, it is for the trier of fact to say whether or not the crucial and necessary facts have been established."].)

Proceeding to the third and final issue, the court—as fact finder—should have adjudicated whether Perez proved by a preponderance of the evidence the facts necessary to the defense of fraud in the execution, i.e., whether Perez's evidence " 'more likely than not' " (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1305, fn. 28) established (1) R.M.T. and/or Sun Pacific Shippers misrepresented the character of the arbitration agreement (see *Rosenthal*, *supra*, 14 Cal.4th at p. 420; *Mt. Holyoke Homes*, *supra*, 219 Cal.App.4th at p. 1308); and (2) Perez reasonably relied on this misrepresentation (see *Ramos*, *supra*, 242 Cal.App.4th at pp. 688–689). Concerning Perez's evidence, the court merely recited the contents of the February 14, 2023, declaration and decided this document "creates a factual dispute whether there was mutual assent to enter into an arbitration agreement." One can infer from this finding—at most—Perez's first declaration would satisfy a preliminary burden of production. After the court evaluated and deemed deficient R.M.T.'s declarations, it halted any further inquiry. In other words, the record demonstrates the court did not evaluate whether Perez's declarations were of such strength and credibility they more likely than not established the elements of fraud in the execution. (*Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1477 [court did not "actually perform[] the factfinding function" (italics omitted) relevant to the issue before it]; Cf. *Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 679 [trial court found "credible evidence" establishing necessary fact notwithstanding misallocation error].) "When the record states what was done, it will not be presumed that something different was done." (*Steuri v. Junkin* (1938) 27 Cal.App.2d 758, 760; see *Kemp Bros. Construction, Inc. v.*

21.

*Titan Electric Corp.*, *supra*, at p. 1477 ["Where the record demonstrates the trial judge did not weigh the evidence, the presumption of correctness is overcome."]; *Wise v. Clapper* (1968) 257 Cal.App.2d 770, 776 ["[A] finding should not be presumed or implied where the record discloses that the trial court expressly declined to make it."].)[9]

Since the required determination was not made by the superior court, we cannot say the court would not have ruled in R.M.T.'s favor absent the error.[10]

    c. *Perez may not raise a new theory on appeal.*

For the first time on appeal, Perez contends (1) he was a " 'transportation worker' " exempt from the Federal Arbitration Act (9 U.S.C. § 1 et seq.); (2) California law exclusively governed the arbitration agreement at issue; and (3) Labor Code section 432.6 rendered the agreement unenforceable. We will not address the argument at this time. "Issues raised for the first time on appeal or rehearing will normally not be

---

[9] Accordingly, we reject Perez's entreaties for us to assume the superior court actually weighed his evidence under the preponderance-of-the-evidence standard and conclude substantial evidence supported this phantom finding. (See *Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320 [" '[The] basis for application of the substantial evidence rule is the theory that the trier of fact is in the best position to determine the value and weight to be attributed to evidence. [Citation.] The rule thus operates only where it can be presumed that the court has performed its function of weighing the evidence. If analysis of the record suggests the contrary, the rule should not be invoked.' "].)

[10] Perez alleges R.M.T.—in its opening brief—"impl[ies] that the trial court abused its discretion in not ordering an evidentiary hearing." We disagree. In our view, R.M.T. simply asks us to "order the trial court to determine whether an evidentiary hearing is needed to resolve these factual conflicts" on remand. In any event, we decline to do so because such an order would circumvent the procedures for obtaining permission to present oral testimony at a hearing. (See Cal. Rules of Court, rule 3.1306(b) [written request to present oral testimony must be filed "no later than three court days before the hearing"]; see also *City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 465 [superior court did not err in denying request to present live testimony at motion hearing where party failed to comply with Cal. Rules of Court, rule 3.1306]; *Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 352 [the petitioners did not file written request to present oral testimony at hearing pursuant to Cal. Rules of Court, former rule 323].)

considered." (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 391, fn. 10.)  " 'The general rule confining the parties upon appeal to the theory advanced below is based on the rationale that the opposing party should not be required to defend for the first time on appeal against a new theory that "contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial." [Citation.]' [Citation.]" (*Ibid.*; see *Bailon v. Appellate Division* (2002) 98 Cal.App.4th 1331, 1339 ["[A] respondent may assert a new theory to establish that an order was correct on that theory 'unless doing so would unfairly prejudice appellant by depriving him or her of the opportunity to litigate an issue of fact.' " (italics omitted)].)  Should Perez wish to pursue his new theory on remand, he should formally seek leave to amend the appropriate pleading, which will allow R.M.T. to develop any factual or legal defenses thereto and the superior court to consider the merits thereof in the first instance.  (See Code Civ. Proc., § 473, subd. (a).)

## DISPOSITION

The order denying the motion to compel arbitration is reversed.  The matter is remanded to the superior court to determine whether plaintiff Angel Perez proved by a preponderance of the evidence the facts necessary to the defense of fraud in the execution or the defense of unconscionability.  In the interests of justice, the parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5); see *id.*, rule 8.100(g).)

DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


PEÑA, J.

23.